**THE MEAD CORPORATION,**
**Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 98–1569.**

United States Court of Appeals,
Federal Circuit.

March 8, 2002.

---

J. Peter Coll, Jr., Orrick, Herrington & Sutcliffe, LLP, of New York, New York, filed a brief on remand from the Supreme Court of the United States for plaintiff-appellant. With him on the brief was Kristen Bancroft. Of counsel on the brief was Sidney H. Kuflik, Lamb & Lerch, of New York, New York.

Amy M. Rubin, Attorney, Civil Division, International Trade Field Office, Department of Justice, of New York, New York, filed a brief on remand from the Supreme Court of the United States for defendant-appellee. With her on the brief was David M. Cohen, Director, Civil Division, Commercial Litigation Branch Department of Justice, of Washington, DC. Of counsel on the brief was Karen P. Binder, Assistant Chief Counsel, U.S. Customs Service, of New York, New York. Of counsel were William Kanter, and Bruce G. Forrest, Attorneys, Appellate Staff, Civil Division, Department of Justice, of Washington, DC; and Allan L. Martin, Associate Chief Counsel, and Lou Brenner, Attorney, U.S. Customs Service, of Washington, DC; and Edward N. Maurer, Attorney, U.S. Customs Service, of New York, New York.

Terence P. Stewart, Stewart and Stewart, of Washington, DC; David Serko, Serko & Simon, LLP, of New York, New York; Richard M. Belanger, Powell, Goldstein, Frazer & Murphy, LLP, of Washington, DC; and Peter Jay Baskin, Sharretts, Paley, Carter & Blauvelt, P.C., of New York, New York, for amicus curiae

Customs and International Trade Bar Association.

Before NEWMAN, RADER, and SCHALL, Circuit Judges.

RADER, Circuit Judge.

This case is before this court on remand from the Supreme Court of the United States. *United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (*Mead III*). In *Mead Corp. v. United States*, 185 F.3d 1304 (Fed.Cir. 1999) (*Mead II*), this court reversed the Court of International Trade's affirmance of a tariff classification from the U.S. Customs Service (Customs). Customs had classified day planners imported by Mead Corporation (Mead) as bound diaries. In reversing the trial court, this court accorded no deference to the Customs classification. The Supreme Court vacated the judgment of this court in *Mead II* and remanded because this court did not accord deference to the classification under *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

In reconsidering the merits, this court applies *Skidmore* deference to the classification ruling at issue. Because Customs' classification of Mead's day planners within subheading 4820.10.20 of the Harmonized Tariff Schedules of the United States (HTSUS) does not persuade under the *Skidmore* standard, this court reverses.

## I.

At issue are five models of Mead's day planners (model nos. 47192, 47062, 47124, 47104, and 47102). The day planners differ from each other only stylistically based on size (ranging from 7 1/2″ × 4 3/8″ to 12″ × 10 5/8″), outer jacket cover material, and type of closure. The basic model contains a calendar, a section for daily notes, a section for telephone numbers and addresses, and a notepad. The larger models contain the features of the basic model with additional items such as a daily planner section, plastic ruler, plastic pouch, credit card holder, and computer diskette holder. A loose-leaf ringed binder holds the contents of the day planner, except for the notepad, which fits into the rear flap of the day planner's outer cover.

In a January 11, 1993 ruling, Customs classified the subject planners as bound diaries under subheading 4820.10.20 (emphasis added):

| | |
|---|---|
| 4820 | Registers, account books, notebooks, order books, receipt books, letter pads, memorandum pads, *diaries and similar articles*, exercise books, blotting pads, binders (looseleaf or other), folders, file covers, manifold business forms, interleaved carbon sets and other articles of stationery, of paper or paperboard; albums for sample or for collections and book covers (including cover boards and book jackets) of paper or paperboard: |
| 4820.10 | Registers, account books, notebooks, order books, receipt books, letter pads, memorandum pads, *diaries and similar articles:* |
| 4820.10.20 | *Diaries,* notebooks and address books, *bound;* memorandum pads, letter pads and similar articles |

Customs' original 1993 ruling offered little explanation for classifying Mead's day planners as bound diaries. After Mead protested, Customs issued a new ruling on October 21, 1994, with more detailed rea-

soning about the classification under subheading 4820.10.20. This 1994 ruling is at issue in this case.

Moving for summary judgment in the trial court, Mead asserted both that its imports were not diaries and were not bound. Either contention, if accepted, compels classification under the "other" provision of subheading 4820.10.40. Under that subheading, Mead would owe no tariff on the imported articles, in contrast with the 4.0% tariff assessed in Customs' 1993 ruling. In support of its motion, Mead submitted dictionary definitions of the terms at issue, affidavits from seven individuals from the U.S. stationery goods industry, and affidavits from two bookbinding experts. The Government crossmoved for summary judgment in support of Customs' classification, offering its own definitions of "diary" and "bound," and submitting supporting affidavits.

In a July 14, 1998 opinion (No. 98–101), the trial court granted the Government's motion. The Court of International Trade broadly defined "diaries" as "articles whose principle purpose is to allow a person to make daily notations concerning events of importance." Under that definition, the trial court decided that Mead's day planners qualify as diaries even though they admittedly contain "supplementary material"—non-diary elements such as a section for addresses and telephone numbers. With respect to the term "bound," the trial court opined: "The common meaning of 'bound' is fastened. The irrevocability of the fastening is not important so long as it goes beyond the transitory role of packaging." The trial court thus found that Mead's day planners, whose contents fit in a loose-leaf ringed binder, fall within that broad definition of "bound."

Mead argued for a different definition of "diaries": "A book for recording a person's observations, thoughts and/or events." Mead further contended that "bound" applies only when pages are "permanently secured along one edge between covers in a manner traditionally performed by a bookbinder." Reversing the Court of International Trade, this court held that Mead's day planners were neither "diaries" nor "bound." *Mead II*, 185 F.3d at 1311. Thus, this court concluded that the day planners required classification under the "other" provision of subheading 4820.10.40. In reaching its conclusion, this court did not accord ordinary classification rulings the deference described in *Chevron U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The United States then petitioned for a writ of certiorari to the United States Supreme Court. The Supreme Court granted certiorari, 530 U.S. 1202, 120 S.Ct. 2193, 147 L.Ed.2d 231 (2000), to determine "the limits of *Chevron* deference owed to administrative practice in applying a statute." *Mead III*, 533 U.S. at 226, 121 S.Ct. at 2171. The Court held that classification rulings, although "beyond the *Chevron* pale," may merit some deference under *Skidmore. Id.* at 220, 121 S.Ct. at 2167. The Court vacated and remanded the earlier judgment of this court with instructions to consider Customs' classification ruling under the principles in *Skidmore. Id.* at 237–38, 121 S.Ct. at 2177.

## II.

This court reviews the Court of International Trade's grant of summary judgment without deference. *Sharp Microelectronics Tech., Inc. v. United States,* 122 F.3d 1446, 1449 (Fed.Cir.1997). Where, as here, the parties do not dispute material facts regarding the imported

goods, this court's review of the classification of the goods collapses into a determination of the proper meaning and scope of the HTSUS terms, which, as a matter of statutory interpretation, is a question of law. *See SGI, Inc. v. United States,* 122 F.3d 1468, 1471 (Fed.Cir.1997).

■ In keeping with the Supreme Court's instructions in *Mead III,* this court affords a classification ruling deference in accordance with the principles set forth in *Skidmore. Mead III,* 533 U.S. at 219–20, 121 S.Ct. at 2167. Under *Skidmore,* a classification ruling receives a measure of deference proportional to its "power to persuade." *Id.; Skidmore,* 323 U.S. at 140, 65 S.Ct. 161. That power to persuade depends on the thoroughness evident in the classification ruling, the validity of its reasoning, its consistency with earlier and later pronouncements, the formality attendant the particular ruling,[1] and all those factors that give it power to persuade. *Mead III,* 533 U.S. at 219–20, 121 S.Ct. at 2167; *Skidmore,* 323 U.S. at 140, 65 S.Ct. 161. In addition, Customs' relative expertise in administering the tariff statute often lends further persuasiveness to a classification ruling, entitling the ruling to a greater measure of deference. While this court therefore recognizes its responsibility to accord a classification ruling the degree of deference commensurate with its power to persuade, this court also recognizes its independent responsibility to decide the legal issue regarding the proper meaning and scope of the HTSUS terms. *Rocknel Fastener, Inc. v. United States,* 267 F.3d 1354, 1358 (Fed.Cir.2001).

### III.

■ This court construes a tariff term according to its common and commercial

meanings, which it presumes are the same. *See Simod Am. Corp. v. United States,* 872 F.2d 1572, 1576 (Fed.Cir.1989). To discern the common meaning of a tariff term, this court consults dictionaries, scientific authorities, and other reliable information sources. *See C.J. Tower & Sons of Buffalo, Inc. v. United States,* 69 C.C.P.A. 128, 673 F.2d 1268, 1271 (Fed.Cir.1982).

### A. Diaries

■ Customs gleaned its broad meaning of diaries from three prior cases. In *Baumgarten v. United States,* 49 Cust. Ct. 275, Abstract No. 67150 (1962), the court considered a plastic-covered book, 4 1/4″ by 7 3/8″, having pages for addresses and telephone numbers followed by ruled pages allocated to the days of the year and the hours of the day. Calendars for the current and following months headed the ruled pages. The importer invoiced the articles as "desk-diaries." In classifying them as diaries rather than as "other blank books and slate books," the court looked first to the definition of a diary in *Webster's New International Dictionary of the English Language* (2d ed. 1951): "A register of daily events or transactions; a daily record; journal; esp., a book for personal notes or memoranda, or for details of experiences or observations of the writer; also, a blank book for daily memoranda." *Baumgarten,* 49 Cust. Ct. at 276. Based on this definition, the court decided:

> [T]he particular distinguishing feature of a diary is its suitability for the receipt of daily notations .... By virtue of the allocation of spaces for hourly entries during the course of each day of the year, the books are designed for that

---

**1.** Certain rulings—specifically, those that have the "effect of changing a practice"—undergo notice-and-comment procedures. 19

C.F.R. § 177.10(c) (2001). This case does not involve such a ruling.

very purpose. That the daily events to be chronicled may also include scheduled appointments would not detract from their general character as appropriate volumes for the recording of daily memoranda.

*Id.*

In *Brooks Brothers v. United States*, 68 Cust. Ct. 91 (1972), the court considered an "Economist Diary," a 10″ by 8″ spiral bound article, covered in red leather, with fine plate-finish parchment. The importer did not dispute that the Diary featured pages suitable for use as a diary, but argued that the Diary also contained printed informational material such as maps and thus could not be classified as "Blank books, bound: Diaries." Discussing *Baumgarten,* the trial court noted: "Judicial authority, therefore, has adopted the crux of the lexicographic definitions that the 'particular distinguishing feature of a diary is its suitability for the receipt of daily notations.'" *Id.* at 97. The court concluded that although the informational pages added to the usefulness or value of the article, the diary portion of the Economist Diary, "clearly 'suitable for the receipt of daily notations,'" controlled the classification. *Id.* at 97–98.

Finally, in *Charles Scribner's Sons v. United States*, 6 CIT 168, 574 F.Supp. 1058 (1983), the court classified an "Engagement Calendar," a 9 3/8″ by 6 1/2″ spiral bound article with photographs on the left side and a table of the days of the week on the right, as a calendar rather than a diary. It acknowledged the *Baumgarten* and *Brooks Brothers* cases, but decided that, in contrast to a diary that is "primarily intended to be used in connection with extensive notations," the article at issue was intended only "for a notation of no more than a sentence or two." *Id.* at 175, 574 F.Supp. 1058.

Both Customs and the trial court relied heavily on these cases for their definition of diaries. These cases, however, involved classification of goods under tariff provisions different from the HTSUS at issue in this case. These prior cases therefore supply only limited guidance for this case. In *Charles Scribner's Sons,* for instance, the court decided between classifying the articles as calendars or diaries. Neither party in this case would classify the day planners as calendars. In *Baumgarten,* the court classified the articles at issue under the Tariff Act of 1930, which provided sparse guidance under Schedule 14 ("Papers and Books"):

Blank books and slate books:

Address books, diaries, and notebooks

Other

Likewise, the court in *Brooks Brothers* decided its case with similarly sparse guidance under the old Tariff Schedule of the United States (TSUS):

Schedule 2. Wood and Paper; Printed Matter

Part 4. Paper, Paperboard, and Products Thereof

Subpart C. Paper and Paperboard Cut to Size or Shape; Articles of Paper and Paperboard

Blank books, bound:

| 256.56 | Diaries, notebooks, and address books |
| 256.58 | Other |

These earlier tariff schedules do not contain the specificity of the corresponding HTSUS headings. The more precise HTSUS classification scheme, which distinguishes diaries from articles similar to diaries, necessitates a more precise definition of the terms at issue. Stated another

way, while the blunt dividing line in *Baumgarten* and *Brooks Brothers* distinguished diaries from other blank books, this court must distinguish diaries from account books, notebooks, receipt books, and other articles similar to diaries. Thus, this court must define and differentiate diaries with a finer point than those earlier cases.

The *Oxford English Dictionary*, at 612 (1989), defines a diary as: "1. A daily record of events or transactions, a journal; specifically, a daily record of matters affecting the writer personally, or which come under his personal observation." This definition largely comports with the definition cited in *Baumgarten* and with other dictionary definitions. The *American Heritage Dictionary of the English Language*, at 516 (3d ed.1992), for example, defines a diary as: "1. A daily record, especially a personal record of events, experiences, and observations, a journal." *See also Webster's New Twentieth Century Dictionary of the English Language* at 504 (2d ed.1961) ("1. a daily written record, especially of the writer's own experiences, thoughts, etc.").

These definitions reflect two key aspects of a diary. A diary provides space for a record, especially, as the Court of International Trade recognized, "concerning events of importance." Thus, a diary facilitates recording more than the mere date or time of events, but also more detailed observations, thoughts, or feelings about those events. This court, however, would not expand a diary record to embrace a broad range of writings embraced by the term "notations." To the contrary, the term "notations" encompasses the use of only a word or a brief phrase—writings

too brief to include details about events, observations, thoughts, or feelings. To constitute a diary record at all, then, notations must be relatively extensive. In the words of *Charles Scribner's Sons*, a diary must have space for "more than a sentence or two." 6 CIT at 175, 574 F.Supp. 1058.

In addition, a diary is a "record" in the sense that it "recalls or relates *past* events." *Webster's Ninth New Collegiate Dictionary* at 984 (1990) (emphasis added). A diarist records events, observations, feelings, or thoughts after they happen. A diary is retrospective, not prospective. A diary is not a place to jot down the date and time of a distant dentist appointment, regardless of whether that appointment would constitute an "event of importance."

Applying these aspects of the definition of a diary, the imports are articles similar to diaries (encompassed by "other" in subheading 4820.10.40), rather than diaries themselves under subheading 4820.10.20. With regard to the question of sufficient space to record detailed observations, this court notes that the Government's brief does not identify which part of the imports constitutes the diary portion. The record suggests that the trial court below focused on the "daily planner" section, which all five imported models have in common.[2] The daily planner section includes a series of pages allocated to days and numbered with the hours of the day along the left hand side of the page. Two blank lines (four shorter lines in the largest model) extend to the right of each hour. The very limited space provided by these blank lines would not permit a diarist to record detailed notations about events, observations, feelings, or thoughts. This limited space

---

**2.** To the extent the Government relies on any other portion of the day planners not discussed herein, this court has considered all sections and has determined that none qualify the article as a diary.

permits only the briefest notations. Space for only a word or phrase disqualifies these articles as diaries.

Moreover, an examination of the articles shows that the few lines for recording events does not envision recording of past events. The caption "Daily Planner" appears at the top of each page. The word "Appointments" appears above the blank lines. These pages facilitate advance planning and scheduling. As noted above, however, a diary is not a planning tool. Instead, a diary receives a retrospective record of events, observations, thoughts, or feelings. Mead markets its entire article as a "Day *Planner*," further buttressing the distinction between this prospective scheduling article and a diary. While the importer's marketing of the goods will not dictate the classification, such evidence is relevant to the determination and, in this case, weighs against classifying the articles as diaries. Indeed, the earlier trade cases—*Baumgarten* (desk-diaries); *Brooks Brothers* (Economist Diary); *Charles Scribner's Sons* (Engagement Calendar)—turned at least in part on the fact that the importers themselves regarded their articles either as diaries or as calendars. *See, e.g.*, *Brooks Brothers*, 68 Cust. Ct. at 98 ("[T]he Economist Diary is ... by its own description a 'diary.' ").

Thus, although mindful of Customs' relative expertise in classifying imported articles and its consistency in classifying day planners and other similar articles as bound diaries since 1993, this court concludes that Mead's imported day planners are not "diaries" (nor any form of a diary) within the meaning of subheading 4820.10.20. This conclusion alone compels the classification of the subject articles under the "other" provision of subheading 4820.10.40.

## B.  Bound

Reasoning that the tariff provisions at issue cover a "wide variety of book and non-book articles," the trial court eschewed the meaning of "bound" as used in the trade of book manufacturing. While heading 4820 covers book and non-book articles, the term "bound" does not appear in that heading. Rather, the term appears for the first time in subheading 4820.10.20 where it modifies "Diaries, notebooks and address books." These three items, the parties agree, are all books. Thus, the proper context to ascertain the meaning of "bound" is in the context of the manufacture of books. The trial court interpreted the term "bound" more broadly because it applied the term to non-book articles as well. In proper context, however, the HTSUS subheading uses "bound" in connection with types of books. Therefore, anchored to this correct context, this court seeks the meaning of that term.

*The Dictionary of Publishing*, at 43–44 (1982), defines the term "bound book" as: "Books that have been cased in, usually referring to books that have been sewn, glued, or stapled into permanent bindings." *Webster's Ninth New Collegiate Dictionary* defines "bound" as "4. *of a book:* secured to the covers by cords, tapes, or glue." These definitions within the proper context describe binding methods and materials as permanent. Thus, this court concludes that the term "bound," when used with reference to books as in subheading 4820.10.20, means permanently secured or fastened. In addition, affidavits from bookbinding and stationery goods experts in the record confirmed this meaning of the term "bound" in its proper context.

Customs' definition of "bound," in contrast, essentially disregards the bookbin-

der's meaning of the term. The HTSUS specifies a "bound diary." This specificity contemplates the existence of an "unbound diary." The Customs definition, however, would make the meaning of "bound" (fastened regardless of the permanency) so broad that it leaves no room for an "unbound diary." The Government argues that a stack of loose-leaf pages could constitute an unbound diary. While such a stack would certainly be unbound, the record as a whole does not suggest that this stack would qualify as a diary. The definition adopted in this opinion, however, leaves room for a class of goods to qualify as unbound diaries, namely, those not permanently fastened. In sum, the imported articles are not "bound" because they are in loose-leaf binders.

### IV.

Despite Customs' relative expertise and the reasoning in its classification ruling, for the reasons stated above, this court holds that Mead's day planners are neither "diaries" nor "bound." The classification ruling at issue here lacks the power to persuade under the principles set forth in *Skidmore*. Because the imported articles are properly classified under the "other" provision of subheading 4820.10.40, this court reverses the decision of the Court of International Trade.

### COSTS

Each party shall bear its own costs.

### REVERSED