**UNITED TECHNOLOGIES CORPORATION, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 02–1237.

United States Court of Appeals, Federal Circuit.

Jan. 7, 2003.

Barry E. Cohen, Crowell & Moring, LLP, of Washington, DC, argued for plaintiff-appellant.

Saul Davis, Senior Trial Counsel, International Trade Field Office, Civil Division, Department of Justice, of New York, NY, argued for defendant-appellee. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC; and John J. Mahon, Acting Attorney in Charge, International Trade Field Office. Of counsel on the brief was Beth C. Brotman, Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs Service, of New York, NY. Of counsel was Karen P. Binder, Attorney.

Before MAYER, Chief Judge, SCHALL and DYK, Circuit Judges.

MAYER, Chief Judge.

United Technologies Corporation appeals the judgment of the United States Court of International Trade affirming the Customs Service's denial of duty-free treatment for its importation of certain aircraft engine parts. *United Techs. Corp. v. United States,* No. 96–02–00635 (Ct. Int'l Trade Dec. 13, 2001). Because neither the tariff schedule nor the Agreement on Trade in Civil Aircraft and its implementing legislation require duty-free treatment here, we affirm.

## Background

Pratt & Whitney, a division of United Technologies Corporation ("United Tech-nologies"), imported experimental aircraft engine parts between October of 1991 and November of 1995. The Customs Service ("Customs") had a properly executed "Blanket Certification for Civil Aircraft Parts" on file in accordance with 19 C.F.R. § 10.183(c)(2). The parts were intended for use in test engines, which were to be fired and run in test cells on the ground. They were classified under the Harmonized Tariff Schedule of the United States ("HTSUS"), 19 U.S.C. § 1202, subheading 8411.91.9080, as parts of aircraft turbines, dutiable at 3.7 percent *ad valorem* for the 1991–1994 entries and 3 percent *ad valorem* for the 1995 entries. Customs levied the listed duties, but United Technologies contended that the parts should have received duty-free treatment pursuant to General Note 3(c)(iv) of the HTSUS entitled "Articles for Duty–Free Treatment Pursuant to the Agreement on Trade in Civil Aircraft" (renumbered without substantive change as General Note 6 in 1993) (hereinafter "Note 3(c)(iv)"). Note 3(c)(iv) accorded duty-free status to imported articles for "use in civil aircraft." United Technologies filed seven protests with Customs and requested review by Customs Headquarters. In Headquarters Ruling 954058 (April 14, 1995), Customs held that the parts did not qualify under Note 3(c)(iv) because they were to be used in ground test cells and were not imported for actual "use in civil aircraft." The protests were denied and United Technologies appealed to the Court of International Trade. The court consolidated the protests and affirmed Customs' rulings. United Technologies filed this timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## Discussion

We review a grant of summary judgment by the Court of International

Trade without deference. *Mead Corp. v. United States,* 283 F.3d 1342, 1345 (Fed. Cir.2002). Customs' rulings, interpretations, and opinions are accorded consideration in proportion to their power to persuade. *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944); *see United States v. Mead Corp.,* 533 U.S. 218, 235, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (according Customs' classification ruling *Skidmore* deference). When we engage in statutory interpretation, our analysis proceeds *de novo. Mead,* 283 F.3d at 1346 (While we recognize the responsibility to accord a Customs' ruling the "degree of deference commensurate with its power to persuade, this court also recognizes its independent responsibility to decide the legal issue regarding the proper meaning and scope of the HTSUS terms.").

At issue here is whether the experimental aircraft engine parts imported by United Technologies qualify for duty-free treatment under Note 3(c)(iv) of the HTSUS, which states in relevant part:

> Whenever a product is entered under a provision for which the rate of duty "Free (C)" appears in the "Special" subcolumn, the importer shall file a written statement, accompanied by such supporting documentation as the Secretary of the Treasury may require, with the appropriate customs officer stating that the *imported article has been imported for use in civil aircraft, that it will be so used* ... For purposes of the tariff schedule, the term *"civil aircraft"* means all aircraft other than aircraft purchased for use by the Department of Defense or the United States Coast Guard.

19 U.S.C. § 1202, General Note 3(c)(iv) (emphasis added). United Technologies asserts that Customs improperly narrowed the scope of its product coverage by interpreting the phrase "for use in civil aircraft" to mean that the parts must be placed "in service on commercial aircraft." Customs Service, HQ 954058, at 3. It contends instead that the parts are covered by Note 3(c)(iv) if they are generally for use in civil aircraft, but not necessarily destined for installation on civil aircraft. United Technologies argues that its proffered broader scope of product coverage of Note 3(c)(iv) is reflected in (1) the Note's origin, the Agreement on Trade in Civil Aircraft, April 12, 1979, 31 U.S.T., T.I.A.S. No. 9620, and (2) its implementing legislation, the Civil Aircraft Agreement, Pub.L. No. 96–36, § 601, 93 Stat. 144 (1979). Accordingly, we address these agreements first, and then look to Note 3(c)(iv).

■■■■ The terms of a treaty are to be given their ordinary meaning in the context of the treaty, and are to be interpreted to best fulfill the purpose of the treaty. *Xerox Corp. v. United States,* 41 F.3d 647, 652 (Fed.Cir.1994). This general rule of construction also applies to international agreements, for which we will more strictly construe the agreement's plain meaning. *See Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 262, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984) (Stevens, J., dissenting on other grounds) ("General rules of construction apply to international agreements."); *Flying Tiger Line, Inc. v. United States,* 145 Ct.Cl. 1, 170 F.Supp. 422, 426 (1959) ("The document [the Warsaw Convention] being a writing accomplished by international agreement, an American court does not have the right to interpret it as freely as it might interpret an American statute or contract.").

The Agreement on Trade in Civil Aircraft ("Agreement") was negotiated in 1979 pursuant to the Trade Act of 1974, under the auspices of the General Agreement on Tariffs and Trade, to dismantle trade restrictions in the aerospace industry by eliminating tariffs on specified products. The relevant sections of the Agreement are as follows:

*Article 1  Product Coverage*

    1.1  This Agreement applies to the following products:

    (a) all civil aircraft,

    (b) all civil aircraft engines and their parts and components,

    (c) all other parts, components, and sub-assemblies of civil aircraft,

    (d) all ground flight simulators and their parts and components,

* * *

    1.2  For the purposes of this Agreement "civil aircraft" means (a) all aircraft other than military aircraft and (b) all other products set out in Article 1.1 above.

*Article 2  Customs Duties and Other Charges*

Signatories agree:

    2.1.1  to eliminate by 1 January 1980 . . . all customs duties and other charges of any kind levied on, or in connection with, the importation of products, . . . if such products are *for use in a civil aircraft, and incorporation therein,* in the course of its manufacture, repair, maintenance, rebuilding, modification or conversion.

(Emphasis added.)

■ United Technologies argues that the experimental engine parts at issue are covered by the Agreement because they fall under article 1.1 subsection (b), all civil aircraft engine parts. In support of this argument, United Technologies first posits that the scope of the Agreement's product coverage should be interpreted broadly because its preamble states that the signatories desire "to achieve maximm [sic] freedom of world trade in civil aircraft, parts and related equipment," and an interpretation narrowly construing its scope derogates the purpose of the Agreement. We think, however, that although the pream-

ble reflects the signatories' general intentions to remove trade barriers in the civil aircraft trade, it does not contribute to the analysis of the scope of the coverage of the Agreement.

United Technologies also contends that article 2.1.1 does not narrow the scope of the products set out in article 1.1 for two reasons. First, "for use in civil aircraft" does not limit the scope of coverage to parts installed on aircraft, but merely distinguishes the covered products from those with military uses per article 1.2. Second, "incorporation therein" is superfluous and should be disregarded because ground flight simulators, listed in article 1.1 subsection (d), cannot be incorporated into civil aircraft.

Article 1.1 must be read in context with the limiting language in article 2.1.1 (and the identical language found in the Annex, "Product Coverage"). While article 1.2 defines the term "civil aircraft" and its related parts as those not intended for military application, this distinction does not define the phrase *"for use in* civil aircraft" in article 2.1.1. The common meaning of "use" is "bring into service," *The Concise Oxford Dictionary* 1545 (9th ed.1995), and an "aircraft" is "a machine capable of flight," *id.* at 28, 170 F.Supp. 422. Thus, in plain language, covered parts include those civil aircraft parts that are brought into service on machines capable of flying, and does not include parts for ground-fired test cells. The phrase "for use in civil aircraft" coupled with "incorporation therein" indicates that the covered aircraft engine parts must be actually installed on civil aircraft. *See id.* at 688, 170 F.Supp. 422 (defining "incorporate" as "unite; form into one body or whole"). And article 2.1.1's enumerated uses for the covered parts: manufacture, repair, maintenance, rebuilding, modification and conversion, do not include testing or development.

We recognize that a ground flight simulator cannot be incorporated into a civil aircraft. But we will not engage in an interpretation that creates an absurd result. *See Pitsker v. Office of Pers. Mgmt.*, 234 F.3d 1378, 1383 (Fed.Cir.2000). Moreover, such an overly literal application of subsection 2.1.1 to article 1.1 does not eviscerate the importance of the term "incorporation." Article 1, read in light of article 2.1.1 and the Annex, dictates that the products covered by the Agreement include civil aircraft and their incorporated respective parts, and ground flight simulators of civil aircraft and their incorporated respective parts. The Agreement, however, is not controlling if it conflicts with its implementing legislation or the HTSUS. *See Suramerica de Aleaciones Laminadas, C.A. v. United States*, 966 F.2d 660, 667 (Fed.Cir.1992). Thus we look next to the legislation.

The Civil Aircraft Agreement sets out verbatim what became Note 3(c)(iv), using the same "for use in civil aircraft" language from the Agreement on Trade in Civil Aircraft. § 601(a)(1), 93 Stat. at 144. Its implementing language under our reading, however, does not affect the analysis of the scope of product coverage of Note 3(c)(iv). Thus we go directly to the language of the Note.

██ To obtain duty-free treatment, Note 3(c)(iv) states "that the imported article has been imported for use in civil aircraft, [and] *that it will be so used ....*" (Emphasis added.) United Technologies hinges its statutory argument that the phrase "for use in civil aircraft" means that the imported parts need not be actually installed on civil aircraft upon two premises. First, it asserts that the language of Note 3(c)(iv), that " *'civil aircraft'* means all aircraft other than aircraft purchased for use by the Department of Defense or the United States Coast Guard," dictates that "for use in civil aircraft" merely means non-military aircraft and parts. Second, it contends that the absence of any language explicitly mandating "installation" on an aircraft demonstrates that none is required.

We agree with Customs' interpretation that Note 3(c)(iv) requires that covered parts be used in actual flight. However, because it relies on one subsequent Headquarters Ruling, and discusses it only in a conclusory manner, we think it is of minimal persuasive value. *See Mead*, 533 U.S. at 235, 121 S.Ct. 2164 (stating that Customs' classification ruling's power to persuade is dependent upon "the merit of its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight").

As with the Agreement, the adjective "civil" defines "civil aircraft" as non-military, but it does not affect the term "for use in civil aircraft." We need not reconstrue the meaning of "for use in civil aircraft" because Note 3(c)(iv) is entitled "Articles Eligible for Duty–Free Treatment Pursuant to the Agreement on Trade in Civil Aircraft," and we see no conflict between Note 3(c)(iv) and the Agreement. Thus we conclude that Note 3(c)(iv) does not accord duty-free treatment to experimental civil aircraft parts which are not intended for installation on civil aircraft. The absence of separate "installation on an aircraft" language is irrelevant. The phrase "that it will be so used," like "incorporation therein" from the Agreement, requires installation; United Technologies cannot aver that the parts will be so used.

### Conclusion

Accordingly, the judgment of the U.S. Court of International Trade is affirmed.

*AFFIRMED.*