SLIP OP. 05-47

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: RICHARD K. EATON, JUDGE

_____
                                          :
RESER'S FINE FOODS, INC.,                 :
D/B/A SIDARI'S ITALIAN FOODS,             :
                                          :
             PLAINTIFF,                   :
                                          :
      v.                                  :    COURT NO. 00-00021
                                          :
UNITED STATES,                            :
                                          :
             DEFENDANT.                   :
_____:

[Plaintiff's motion for summary judgment denied; Defendant's cross-motion for summary judgment granted]


                                          Dated: April 12, 2005


        *Fitch, King and Caffentzis* (*James Caffentzis*), for plaintiff Reser's Fine Foods, Inc., d/b/a Sidari's Italian Foods.

        *Peter D. Keisler*, Assistant Attorney General, Civil Division, United States Department of Justice; *Barbara S. Williams*, Acting Attorney in Charge, International Trade Field Office (*Mikki Graves Walser*); *Michael W. Heydrich*, of counsel, Office of the Assistant Chief Counsel for United States Customs and Border Protection, for defendant United States.


                              MEMORANDUM

EATON*, Judge*: This case is again before the court on cross-motions for summary judgment

pursuant to USCIT R. 56. Previously, both parties made similar motions, each of which was

denied because there remained questions with respect to material facts. *See Reser's Fine Foods,*

*Inc. v. United States*, 27 CIT __, slip op. 03-117 (Sept. 5, 2003) ("*Reser's I*"). Now, following

renewed discovery and the filing of new affidavits, interrogatory responses, deposition

transcripts, and physical and documentary evidence, each party has renewed its motion. Plaintiff

Reser's Fine Foods, Inc., d/b/a Sidari's Italian Foods ("Reser's") again challenges the United

States Customs Service's ("Customs")[1] classification of its entries of artichokes as "Other

vegetables prepared or preserved otherwise than by vinegar or acetic acid, not frozen, other than

products of heading 2006 . . . Other vegetables and mixtures of vegetables . . . Artichokes," under

subheading 2005.90.80 of the Harmonized Tariff Schedule of the United States (1998)

("HTSUS") and subject to a tariff rate of 15.8% *ad valorem*. Plaintiff argues that the

merchandise is properly classifiable under HTSUS subheading 0711.90.60 as "Vegetables

provisionally preserved (for example, by sulfur dioxide gas, in brine, in sulfur water or in other

preservative solutions), but unsuitable in that state for immediate consumption . . . Other

vegetables; mixtures of vegetables . . . Other vegetables; mixtures of vegetables," subject to a

tariff rate of 9.1% *ad valorem*. By its cross-motion, defendant United States, on behalf of

Customs, again maintains that the merchandise is properly classifiable under HTSUS subheading

2005.90.80, and asks the court to deny plaintiff's motion and dismiss this action. The court has

jurisdiction pursuant to 28 U.S.C. § 1581(a) (2000).

This court may resolve a classification issue by means of summary judgment. Summary

judgment is appropriate "if the pleadings, depositions, answer to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material

---

[1]        Effective March 1, 2003, the Unites States Customs Service was renamed the
Bureau of Customs and Border Protection. *See* Reorganization Plan Modification for the Dep't
of Homeland Security, H.R. Doc. 108-32 at 4 (2003).

fact. . . ." USCIT R. 56(c). Summary judgment of a classification issue "is appropriate when there is no genuine dispute as to the underlying factual issue of exactly what the merchandise is." *Bausch & Lomb*, 148 F.3d at 1365 (citing *Nissho Iwai Am. Corp. v. United States*, 143 F.3d 1470, 1472 (Fed. Cir. 1998); *IKO Indus., Ltd. v. United States*, 105 F.3d 624, 626–27 (Fed. Cir. 1997); *Rollerblade, Inc. v. United States*, 112 F.3d 481, 483 (Fed. Cir. 1997). Under 28 U.S.C. § 2639(a)(1), Custom's classification of merchandise is presumed to be correct. In the context of summary judgment, however, since there are no disputes with respect to the material facts, the presumption does not shift the burden to the plaintiff. *See Mead Corp. v. United States*, 283 F.3d 1342, 1346 (Fed. Cir. 2002) (where court determines that there is no dispute of material facts, its "review of the classification of goods collapses into a determination of the proper meaning and scope of HTSUS terms, which, as a matter of statutory construction, is a question of law."). For the reasons set forth below, the court denies plaintiff's summary judgment motion, and grants that of defendant United States.

BACKGROUND

In the context of their first cross-motions for summary judgment, the parties agreed that (1) "The merchandise . . . was imported from Spain [and] consists of 88-1/5 ounces of quartered artichoke hearts in a solution of water and acetic acid (0.1%), salt (1.2%) and citric acid (0.6%) packaged in No. 10 cans. The pH of the liquid solution in the imported cans is 3.97"; (2) "Citric acid is used to enhance flavors, increase preservative effectiveness, retard discoloration and conserve energy by reducing heat-processing requirements in vegetable processing"; and (3) "In Spain, the merchandise . . . is packed in cans which are [then] subjected to a thermal process

which expels air, then hermetically sealed and further heated for the purpose of rendering the product commercially sterile." Parties' Joint Statement of Material Facts as to Which There Are No Genuine Issues to be Tried ¶¶ 6–8 ("Parties' Joint Statement"). The evidence submitted in connection with the instant motions, as well as the parties' stated agreement with respect to certain other material facts, will be discussed in the context of the issues presented.

## DISCUSSION

Classification of merchandise under the HTSUS is governed by the General Rules of Interpretation ("GRI"). *See Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citing *Baxter Healthcare Corp. of P.R. v. United States*, 182 F.3d 1333, 1337 (Fed. Cir. 1999)) (noting that the HTSUS General Rules of Interpretation (GRI) and the Additional U.S. Rules of Interpretation (U.S. GRI) govern the proper classification of all merchandise and are applied in numerical order). GRI 1 states that "for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes. . . ." GRI 1. GRI 6 states that "the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any related subheading notes and, *mutatis mutandis*, to the [General Rules of Interpretation] on the understanding that only subheadings at the same level are comparable." GRI 6. Furthermore, "[w]hen . . . a tariff term is not defined in either the HTSUS or its legislative history, 'the term's correct meaning is its common meaning.'" *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1356 (Fed. Cir. 2001) (quoting *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994)); *see also Smith v. United States*, 508 U.S. 223, 228 (1993) ("When a word is not defined by statute,

we normally construe it in accord with its ordinary or natural meaning."). In ascertaining the

meaning of undefined terms, "the court may rely upon its own understanding, dictionaries and

other reliable sources." *Medline Indus., Inc. v. United States*, 62 F.3d 1407, 1409 (Fed. Cir.

1995); *see also Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 789 (Fed. Cir. 1988)

("To assist it in ascertaining the common meaning of a tariff term, the court may . . . consult

lexicographic and scientific authorities, dictionaries, and other reliable information sources.").

Finally, as an aid to understanding the meaning of a tariff term, "a court may refer to the

Explanatory Notes . . . which do not constitute controlling legislative history but nonetheless are

intended to clarify the scope of HTSUS subheadings and to offer guidance in interpreting

subheadings." *Mita*, 21 F.3d at 1082 (citing *Lynteq, Inc. v. United States*, 976 F.2d 693, 699

(Fed. Cir. 1992)); *see* Harmonized Commodity Description and Coding System (3d ed. 2002)

("Explanatory Notes").


In order for merchandise to be classified under HTSUS heading 07.11, it must be

"unsuitable for immediate consumption as imported."[2] In denying the parties' first cross-motions

for summary judgment, the court found that there were material questions of fact with respect to

the suitability of the subject merchandise for immediate consumption. *See Resers I*, 28 CIT at

__, slip op. 03-117 at 3. While both parties now agree that the artichokes are edible in their

imported condition, *see* Pl.'s Br. in Supp. Supplemental Mot. S.J. at 7 ("Pl.'s Br."); Def.'s Mem.

---

[2]        In *Reser's I*, the court dismissed each party's motion for summary judgment because questions remained as to material facts relating to the phrases "provisionally preserved" and "unsuitable for immediate consumption" found in HTSUS heading 07.11. As the court finds that the phrase "unsuitable for immediate consumption" excludes the artichokes from being classified under HTSUS 07.11, matters relating to "provisionally preserved" are not discussed.

in Opp'n to Pl.'s Mot. S.J. and in Supp. Def.'s Cross-Mot. S.J. at 8 ("Def.'s Mem."), plaintiff continues to contend that because the artichokes have "a disagreeable taste which prevents them from being put to their intended use without further processing, " they are unsuitable for immediate consumption. Pl.'s Ex. 7, Goellnitz Aff. ¶ 9. The "further processing" plaintiff refers to consists entirely of removing the artichokes from their shipping solution and spraying them with water. *Id*. at ¶ 8. "In this case, plaintiff has shown that the excess preservative solution must be removed by processing the artichokes after importation. This intermediate processing is a necessary step in making the artichokes suitable for their intended use as an ingredient in artichoke salads." Pl.'s Br. in Supp. Mot. S.J. at 7–8. "The artichokes are dumped on the conveyor. They go through a rinse." Pl.'s Ex. 2, Goellnitz Dep., at 22. The rinse consists of "eleven jets that shoot water in a fan shape formation onto the product . . . ." *Id*. at 24. Mr. Goellnitz estimated that, given the speed of the conveyor belt, the spraying process takes "probably 20, 30 seconds." *Id*. at 25. After rinsing, the conveyor belt takes the artichokes to a sink where they are mixed with peppers, lemon juice, corn oil, spices, and preservatives. *Id*. at 22. The mixture is then put in jars and sold as marinated artichoke salad. *Id*. at 28.

Thus, for plaintiff, the important factor is that, even though the artichokes might be edible as imported, because of their disagreeable taste, they cannot be put to the use for which they were imported without being rinsed. In other words, plaintiff insists that "the term 'unsuitable for immediate consumption' must refer to those edible vegetables which are not in condition for their intended use absent further treatment or processing." Pl.'s Br. at 7.

Defendant does not dispute that the artichokes as imported have a disagreeable taste. Def.'s Mem. at 9.[3] Rather, defendant relies on the notion that the artichokes, as imported, are edible, and are suitable for consumption in the same manner as artichokes sold at retail to the general public.[4] Relying on the evidence of various experts,[5] defendant explains:

> Just as their canned counterparts which are put up for retail sale and suitable for immediate consumption, the imported arctichoke hearts are suitable for immediate consumption upon entry into the United States. The imported merchandise contains the same ingredients as canned artichoke hearts which are put up for retail sale. . . . The amount of acid, as reflected by the pH of the solution, is consistent with that found in similar imported canned artichoke hearts available in retail stores. The imported artichokes hearts have similar or lower levels of salt and preservatives than other canned artichoke hearts which are suitable for immediate consumption.
>
> Finally, the imported artichokes are, or can be, used in the same manner as other canned artichoke hearts which are available in retail stores. . . . Simply put, the imported canned artichoke hearts are suitable for immediate consumption in the same manner as goods of its class which are put up for retail sale.

Def.'s Mem. at 8–9 (internal citations omitted).

---

[3]     Although not explicitly conceding that the artichokes have a "bitter and salty" taste, defendant at no point disputes this fact and indeed implicitly concedes it in its argument. *See* Def's Mem. at 9; see also Def.'s Resp. to Ct. Order Dated Feb. 23, 2005, at 2 ("[T]he Government cannot dispute that the imported merchandise has a 'disagreeable' taste prior to draining and rinsing . . . .").

[4]     There is no disagreement that the artichokes are, in fact, suitable for consumption in the same manner as artichokes sold at retail to the general public. *See* Pl.'s Br. in Resp. to Ct. Order of Feb. 23, 2005, at 1–2, and Def.'s Resp. to Ct. Order Dated Feb. 23, 2005, at 3.

[5]     Defendant relies on the declaration of Robert F. Epperson, a technical consultant for the vegetable processing industry specializing in quality control and food safety issues relating to artichokes, and the declaration and discovery responses of Dr. Sher Paul Singh, a professor with the Michigan State University School of Packaging and a consultant to the packaging industry.

For its part, plaintiff does not claim that defendant is wrong in its contention that the

artichokes, as imported, are the same as those sold at retail. Rather, it contends that all

artichokes imported in the subject merchandise's condition must be rinsed off. *See* Pl.'s Br. at 7

("If not used as an ingredient in marinated salads (plaintiff's use), such artichokes are used as

ingredients in cooking or as pizza toppings. To the best of plaintiff's knowledge, the undesirable

or disagreeable taste does not change and the preservative solution must be removed before being

put to use."); *see also* Pl.'s Br. in Resp. to Ct. Order of Feb. 23, 2005, at 1 ("[T]he artichokes

sold at 'retail' require the same draining of the brine solution and washing or rinsing with water

prior to use.").

The court agrees that defendant has demonstrated that the artichokes are suitable for

immediate consumption,[6] as imported. What plaintiff refers to as "further processing" is no more

---

[6]     Even if plaintiff were to prevail on the question as to the artichokes' suitability for immediate consumption, the merchandise could not be classified under HTSUS subheading 0711.90.60. The Explanatory Note accompanying that subheading states:

> This heading applies to vegetables which have been treated *solely* to ensure their provisional preservation during transport or storage prior to use (e.g., by sulphur dioxide gas, in brine, in sulphur water or in other preservative solutions), **provided** they remain unsuitable for immediate consumption in that state.

Explanatory Note 07.11 (emphasis added; emphasis in original).

As stated in the Parties' Joint Statement, "[t]he merchandise . . . was imported from Spain [and] consists of 88-1/5 ounces of quartered artichoke hearts in a solution of . . . citric acid (0.6%) . . . ." and "[c]itric acid is used to *enhance flavors*, increase preservative effectiveness, retard discoloration and conserve energy by reducing heat-processing requirements in vegetable processing." Parties' Joint Statement ¶¶ 6–7 (emphasis added).

than removing the artichokes from the solution in which they were shipped, then spraying them with water. It is undisputed that a retail consumer would be obliged to perform the same tasks. It can hardly be said that similar merchandise bought at retail is unfit to be consumed immediately. To accept plaintiff's interpretation, the court would have to assume that washing the grit from lettuce before using it in a salad would mean that the lettuce, as it came from the grocery store, was not suitable for immediate consumption.

Indeed, to agree with plaintiff would require the court to alter the ordinary meaning of the phrase "unsuitable for immediate consumption." As previously noted, where a tariff term is not defined, it is presumed to have its common meaning. *See Rocknel Fastener*, 267 F.3d at 1356. In order to determine the common meaning of the phrase "unsuitable for immediate consumption," the court must first determine the meaning of the word "suitable." In this context, the word "suitable" means "adapted to a use or purpose: FIT <food [suitable] for consumption>." Webster's Third New International Dictionary 2286 (3d ed. 1993). Here, there is no question that the artichokes are "fit" for immediate consumption, as they are edible. *See A. Giurlani & Bros., Inc. v. United States*, 9 CIT 60 (1985) (not reported in the Federal Supplement) (denying cross-motions for summary judgment where question as to whether or not merchandise was edible was found to raise an issue of material fact). That the artichokes might not be pleasant to eat prior to rinsing does not render them unfit for immediate consumption as that phrase is commonly understood.

CONCLUSION

The court finds that because the subject merchandise is suitable for immediate consumption, it is excluded from classification under HTSUS heading 07.11 and is properly classified under subheading 2005.90.80 of the HTSUS.  Therefore, the court denies plaintiff's motion for summary judgment and grants that of defendant United States.  Judgment shall be entered accordingly.

_/s/ Richard K. Eaton_
Richard K. Eaton

Dated: April 12, 2005
        New York, New York