Slip Op. 10 - 66

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| DELL PRODUCTS LP,<br><br>            Plaintiff,<br><br>        v.<br><br>UNITED STATES,<br><br>            Defendant. | Before: Richard W. Goldberg,<br>        Senior Judge<br><br>Court No.06-00306 |

OPINION

[Upon classification of secondary batteries, judgment for the defendant.]

Dated: June 10, 2010

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP (David M. Murphy, Ned H. Marshak and Joseph M. Spraragen) for Plaintiff.

Tony West, Assistant Attorney General; Barbara S. Williams, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Amy M. Rubin); Beth C. Brotman, Office of the Assistant Chief Counsel, International Trade Litigation, Bureau of Customs and Border Protection, U.S. Department of Homeland Security, Of Counsel; for Defendant.

Goldberg, Senior Judge: This matter comes before the Court on Plaintiff Dell Products LP's ("Dell" or "Plaintiff") Motion for Summary Judgment and Defendant United States' ("Defendant" or "Government") Cross-Motion for Summary Judgment. Dell contends that the subject batteries should be classified as "automatic data processing machines" under heading 8471 of the

Harmonized Tariff Schedule of the United States ("HTSUS")[1],
duty-free, the same classification as the notebook computers with
which the batteries were packaged.[2]  The Government maintains
that United States Customs & Border Protection ("Customs")
properly classified the subject secondary batteries as "other
storage batteries" under heading 8507, HTSUS, at the scheduled
duty rate of 3.4% ad valorem.[3]  See HQ 967364 (Dec. 23, 2004).

As discussed below, Customs properly classified the
subject batteries as "other storage batteries" under heading
8507, HTSUS.  Accordingly, Dell's motion for summary judgment is
denied, and the Government's cross-motion is granted.

## I. STATEMENT OF THE FACTS

At issue are Dell secondary batteries manufactured for
use with Dell notebook computers.  The batteries can only be used
with specific Dell computer models and are compatible with
multiple computer models.  The secondary battery is an additional
power source that enables longer unplugged operation of the
notebook computer than would be possible with the primary battery

---

[1] All citations to the HTSUS herein are to the 2002 edition.
The pertinent text remains unchanged.

[2] "Automatic data processing machines and units thereof . .
.: Portable automatic data processing machines, weighing not more
than 10 kg, consisting of at least a central processing unit, a
keyboard and a display."  Subheading 8471.30.00, HTSUS.

[3] "Electric storage batteries, including separators, thereof
[sic], whether or not rectangular, (including square); parts
thereof: Other storage batteries: Other."  Subheading 8507.80.80,
HTSUS.

included with, and encased in, the computer.  The primary and
secondary battery cannot be used simultaneously by the same
computer.

The batteries at issue were initially "admitted"[4] into
a Foreign Trade Zone ("FTZ") as non-privileged foreign ("NPF")
merchandise.[5]  The Dell notebook computers were first imported
into the United States and entered for consumption[6] under
subheading 8471.30.00, HTSUS, as "portable digital automatic data
processing machines," then later were admitted into the FTZ in
"domestic status."[7]

---

[4] The Foreign Trade Zone Resource Center Customs Manual
Glossary of Foreign-Trade Zone Terminology defines "Admission" as
"[t]he physical arrival of goods into a zone in a specified zone
status . . . .  The word 'admission' is used instead of 'entry'
to avoid confusion with Customs entry processes . . . ."
Foreign-Trade-Zone Customs Manual, 200, available at
http://www.foreign-trade-zone.com/customs_manual.htm (last
visited June 9, 2010)("FTZ Manual").

[5] "Non-Privileged [sic] Foreign Status" is defined by the
FTZ Manual as "[s]tatus of zone merchandise not previously
cleared by Customs which is appraised in the condition of the
merchandise at the time it enters the Customs territory upon
exiting the zone . . . .  While in the zone, NPF status
merchandise can be manipulated or manufactured into another
commercial item with a different tariff classification.  NPF
status allows zone users to pay duty at the rate of the finished
product produced in the zone."  FTZ Manual at 203.

[6] "Entry" is defined by the FTZ Manual as "[n]otification to
Customs of the arrival of imported goods in the Customs territory
of the U.S.  Merchandise withdrawn from a zone for consumption in
the U.S. is entered when it is removed from the zone.  Goods
brought into a zone are admitted."  FTZ Manual at 201.

[7] "Domestic Status" is defined as "status of zone
merchandise grown, produced or manufactured in the U.S. on which
all internal revenue taxes have been paid or the status of zone
merchandise previously imported on which all applicable duties
and internal revenue taxes have been paid."  FTZ Manual at 201.

Through websites and other means, Dell offered retail customers the option of purchasing a notebook computer, including a primary battery and power adapter, with or without other merchandise. This other merchandise option included the subject secondary batteries. Dell then filled the individual orders by packaging the items ordered by each customer in the FTZ. Dell placed a box containing a notebook computer that already encased a primary battery, into a larger box, along with operational manuals, a power adapter, and any additional items, such as a secondary battery, that the customer opted to purchase. The price that a customer paid consisted of the cost of the notebook computer, which included the primary battery and power cord, plus the cost of any optional items ordered. Dell customers could also purchase secondary batteries independent from a Dell computer. This action consists of Dell secondary batteries purchased and packaged together with notebook computers.

Both parties agree that the subject batteries entered into the commerce of the United States when they were withdrawn from the FTZ and delivered to Dell's U.S. customers and are to be classified based on their condition at this time. Upon entry, Dell classified the secondary batteries with the Dell notebook computers as "automatic data processing machines" under subheading 8471.30.00, HTSUS, duty-free. Customs disagreed and, upon liquidation, classified the subject batteries as "other storage batteries" under subheading 8507.80.80, HTSUS, at the

duty rate of 3.4% <u>ad valorem</u>.  Customs classified the computer,
primary battery, and power cord together under subheading
8471.30.00, HTSUS.  Dell then filed this action challenging
Customs' classification of the subject batteries.


## II. JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 U.S.C. §
1581(a) (2006).  Summary judgment is appropriate if "there is no
genuine issue as to any material fact" and "the movant is
entitled to judgment as a matter of law."  USCIT R. 56(c).
Because the nature of the merchandise at issue is not in
question, there are no disputed material facts in this case.  The
propriety of summary judgment, therefore, turns on the proper
construction of the HTSUS.  <u>See</u> <u>E.T. Horn Co. v. United States</u>,
27 CIT 328, 331 (2003)(<u>quoting</u> <u>Clarendon Marketing, Inc. v.
United States</u>, 144 F.3d 1464, 1466 (Fed. Cir. 1998)).

The Court employs a two-step process in analyzing a
Customs classification.  <u>Bausch & Lomb, Inc. v. United States</u>,
148 F.3d 1363, 1365 (Fed. Cir. 1998).  "[F]irst, [it] construe[s]
the relevant classification headings; and second, [it]
determine[s] under which of the properly construed tariff terms
the merchandise at issue falls."  <u>Id.</u>; <u>see also</u> <u>Universal Elecs.,
Inc. v. United States</u>, 112 F.3d 488, 491 (Fed. Cir. 1997).  The
proper scope and meaning of a tariff classification term is a
question of law; whether the subject merchandise falls within a

particular tariff term as properly construed is a question of fact.  Franklin v. United States, 289 F.3d 753, 757 (Fed. Cir. 2002).  Where the nature of the merchandise is undisputed, as in this case, "'the classification issue collapses entirely into a question of law,' and the court reviews Customs' classification decision de novo."  Id. (quoting Cummins Inc. v. United States, 454 F.3d 1361, 1363 (Fed. Cir. 2006)).[8]

A Customs classification ruling receives deference proportional to its "power to persuade" under the principles of Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).[9]  See United States v. Mead Corp., 533 U.S. 218, 234-35 (2001); Mead Corp. v. United States, 283 F.3d 1342, 1345-46 (Fed. Cir. 2002) (citations omitted).  Customs' "relative expertise in administering the tariff statute often lends further persuasiveness to a classification ruling, entitling the ruling to a greater measure of deference."  Mead Corp. v. United States, 283 F.3d at 1346.

Nevertheless, Customs' classifications are not controlling by reason of their authority and this Court "has an

---

[8] Customs' decisions are entitled to a presumption of correctness under 28 U.S.C. § 2639(a)(1) (2006).  However, where "a question of law is before the Court on a motion for summary judgment, the statutory presumption of correctness is irrelevant."  Blakley Corp. v. United States, 22 CIT 635, 639, 15 F. Supp. 2d 865, 869 (1998) (citing Universal Elecs., Inc. 112 F.3d at 492)).

[9] "Skidmore deference" refers to the following: "The weight of [a Customs judgment] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  Skidmore v. Swift & Co., 323 U.S. at 140.

independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms." Warner-Lambert Co. v. United States, 407 F.3d 1207, 1209 (Fed. Cir. 2005). In determining whether imported merchandise has been properly classified by Customs, this Court must consider whether Customs' classification was correct, "both independently, and in comparison with the importer's alternative." ABB Power Transmission v. United States, 19 CIT 1044, 1046, 896 F. Supp. 1279, 1281 (1995) (quoting Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984)).

### III. DISCUSSION

At issue in the present case is the correct tariff classification of Dell secondary batteries when withdrawn from an FTZ in packages with Dell notebook computers and entered for consumption into the United States.

When interpreting a tariff classification, this Court looks first to the General Rules of Interpretation ("GRIs") governing the classification of imported goods in the HTSUS. Home Depot U.S.A., Inc. v. United States, 491 F.3d 1334, 1336 (Fed. Cir. 2007).[10]  This Court begins its analysis with GRI 1.

_____

[10] The HTSUS consists of the General Notes, the GRIs, the Additional U.S. Rules of Interpretation, and Sections I to XXII of the HTSUS (including Chapters 1 to 99, together with all Section Notes and Chapter Notes, article provisions, and tariff and other treatment accorded thereto), as well as the Chemical Appendix. BASF Corp. v. United States, 482 F.3d 1324, 1325-26 (Fed. Cir. 2007).

See Conair Corp. v. United States, 29 CIT 888, 891 (2005).  GRI 1
states "for legal purposes, classification shall be determined
according to the terms of the headings and any relative section
or chapter notes . . . ."  GRI 1, HTSUS.

If a tariff term is not clearly defined in either the
HTSUS or its legislative history, it may be construed according
to its common meaning.  W.Y. Moberly, Inc. v. United States, 924
F.2d 232, 235 (Fed. Cir. 1991).  In order to determine the common
meaning of a tariff term, the court may rely on its own
understanding of the term, as well as consult dictionaries,
lexicons, the testimony in the record, and other reliable sources
of information.  Ciba-Geigy Corp. v. United States, 25 CIT 1252,
1259, 1265, 178 F. Supp. 2d 1336, 1343, 1349 (2001).  If the
proper classification cannot be determined by reference to GRI 1,
this Court must consider the succeeding GRIs in numerical order.
Conair Corp., 29 CIT at 891.

Although not binding, the Harmonized Commodity
Description and Coding System Explanatory Notes ("ENs") are the
official interpretation of the HTSUS set forth by the World
Customs Organization and offer guidance in interpreting the HTSUS
provisions.  Id.; see also Bauer Nike Hockey USA, Inc. v. United
States, 393 F.3d 1246, 1250 (Fed. Cir. 2004) (explaining that
"[courts] may look to the Explanatory Notes accompanying a tariff

subheading as a persuasive, but not binding, interpretative guide").[11]

Dell asserts that the subject batteries were properly classifiable, together with the Dell notebook computers with which they were packaged, under heading 8471, HTSUS, based on two alternative legal theories.  First, Dell argues that the secondary batteries are "functional units" of the notebook computers, pursuant to GRI 1.  In the alternative, Dell asserts that the batteries should be classified as a component of a "retail set" under GRI 3(b).  Customs responds that the Dell secondary batteries are neither "functional units" nor "retail set" components, as these terms are used for tariff purposes, and that the batteries must be classified separately from the notebook computers.  This court examines Dell's "functional unit" and "retail set" arguments in turn.

### A.  Whether the subject batteries qualify as "functional units"

To determine the correct classification of the subject batteries, this Court will first consider GRI 1.  See Conair Corp., 29 CIT at 891.  Dell relies primarily on Section XVI, Section Note 4, HTSUS ("Section Note 4, HTSUS") which states in relevant part: "[w]here a machine . . . consists of individual components . . . intended to contribute together to a clearly defined function covered by one of the headings in Chapter 84 or

---

[11] All citations to the ENs herein are to the 2002 edition. The pertinent text remains unchanged.

Chapter 85, then the whole falls to be classified in the heading
appropriate to that function."[12]   Section Note 4, HTSUS.   The ENs
explain that:

> For the purpose of this Note, the expression "intended
> to contribute together to a clearly defined function"
> covers only machines and combinations of machines
> <u>essential</u> to the performance of the function specific
> to the functional unit as a whole, and thus excludes
> machines or appliances fulfilling auxiliary functions
> and which do not contribute to the function of the
> whole.

ENs, Section XVI, (VII) Functional Units, Section Note
4, HTSUS ("ENs, Section Note 4, HTSUS")(emphasis added).

Dell claims that the subject secondary battery
contributes to the notebook computer's clearly defined function
covered by heading 8471, HTSUS, which is to automatically process
data.  <u>See</u> Heading 8471, HTSUS.  According to Dell, the secondary
battery is essential for the intended use of the notebook
computer for purchasers for whom plugged-in computing will not be
available for extended periods of time, and therefore, the
batteries are "functional units" pursuant to GRI 1.

The parties agree that the "clearly defined function"
of the notebook computer is "automatic data processing," as
evidenced by the fact that the computers are classifiable in the
tariff provision for "automatic data processing machines."  <u>See</u>
Subheading 8471.30.00, HTSUS.  An important benefit of a notebook
computer is its portable computing function.  The Government does

---

[12] Both Chapter 84 and Chapter 85 (and, thus, both heading
8471 and heading 8507) are within Section XVI of the HTSUS.

not dispute that components that permit the choice between plugged-in computing (a power cord) and stand-alone computing (a battery) are essential to the function specific to the notebook computer, portable computing.

Dell's argument fails because the secondary batteries are not <u>essential</u> to the performance of the function specific to the notebook computer.  <u>See</u> ENs, Section Note 4, HTSUS.  The portable computing function is completely served by the combination of the primary battery encased in the computer and the power adapter.  This court is not convinced that extended unplugged computing, beyond the capabilities of the primary battery, is essential to the performance of the computer's specific function as a notebook computer.  Because the notebook computers are "whole" and can perform the portable computing function before being packaged with a secondary battery, the batteries at issue are not "essential" to the computer's portable computing function.  <u>See</u> Section Note 4, HTSUS; ENs, Section Note 4, HTSUS.

Moreover, none of the examples in the ENs to Section Note 4 suggest that secondary power sources are classifiable as functional units.  <u>See</u> ENs, Section Note 4, HTSUS.  The ENs list examples of functional units within the meaning of Section Note 4.  Dell points out two examples in particular: "[w]elding equipment consisting of the welding head or tongs, with a transformer, generator or rectifier to supply the current" and

"[r]adar apparatus with the associated power packs, amplifiers, etc." ENs, Section Note 4, HTSUS. However, in these examples, it is the article's <u>primary</u> power source that is the component classified under the heading appropriate to the function of the machine. Similarly, in this case, Customs classified the primary battery and power cord, along with the notebook computer, under heading 8471, HTSUS. In contrast, the batteries at issue do not serve as a primary power source. The secondary batteries cannot be used at the same time as the primary battery and are not the type of component covered by Section Note 4, which, <u>together</u>, contribute to a clearly defined function <u>essential</u> to the performance of the notebook computer as a whole. Section Note 4, HTSUS; ENs, Section Note 4, HTSUS.

Ultimately, Dell's position requires an unduly narrow "clearly defined function" of the notebook computer of extended unplugged automatic data processing that ignores the fact that the computer can fully perform the function of portable computing without the subject secondary battery. <u>See</u> Section Note 4, HTSUS. Additionally, the ENs as well as previous Customs rulings do not suggest that secondary power sources are classified as "functional units" for tariff purposes.[13] Thus, the subject

---

[13] Dell refers to NY 872117 (Mar. 13, 1991) where Customs held that a notebook computer, imported with a detachable power cord, two Ni-Cad batteries, and an AC/DC adapter, were classifiable together under heading 8471. Although Dell stresses that the notebook computer in that ruling similarly contained two batteries, it is unclear whether or not the computer required
(footnote continued)

secondary batteries are not "functional units" and are not classifiable under heading 8471, HTSUS pursuant to GRI 1 and Section Note 4 because they are not essential to the portable computing function of the notebook computer.

### B. Whether the secondary batteries qualify as a component of a "retail set"

In the alternative, Dell proposes that the subject batteries are classifiable under heading 8471, HTSUS, pursuant to GRI 3(b) as components of "retail sets."  GRI 3(b) provides that "goods put up in sets for retail sale" shall be classified in the HTSUS heading applicable to the material or component which imparts the "essential character" to the set, in this case, the notebook computer.  GRI 3(b), HTSUS.  The ENs to GRI 3(b) provide that:

> (X) For purposes of this Rule, the term "goods put up in sets for retail sale" shall be taken to mean goods which:
>
> > (a) consist of at least two different articles, which are, prima facie, classifiable in different headings. . . .;
> >
> > (b) consist of products or articles put up together to meet a particular need or carry out a specific activity; and
> >
> > (c) are put up in a manner suitable for sale directly to users without repacking (e.g., in boxes or cases or on boards).

---

both batteries to function nor is there any indication that one of the two Ni-Cad batteries was an optional purchase.  See id. None of the other cases cited by Dell suggest that Customs classifies secondary power sources serving the same function as a primary power source as a "functional unit."

ENs, GRI 3(b), HTSUS.  The parties do not dispute that the
notebook computers and the secondary batteries are prima facie
classifiable in different headings.  Consequently, there is no
dispute regarding Criterion (a) of the ENs to GRI 3(b).
Therefore, this court must consider whether the subject batteries
satisfy Criteria (b) and (c).

> **i.  Whether the packages containing the secondary batteries consisted of products "put up together to meet a particular need or carry out a specific activity."**

Under Criterion (b), goods put up in sets for retail
sale consist of products or articles "put up together to meet a
particular need or carry out a specific activity."  ENs, GRI
3(b), (X)(b), HTSUS ("Criterion (b)").

The parties dispute whether the subject batteries meet
a "particular need" or "specific activity" under Criterion (b).
Dell argues that the "particular need" or "specific activity" met
by the inclusion of the second battery is longer, unplugged
operation of the computer than would be possible with only the
primary battery.  Alternatively, Dell argues that even if the
secondary battery is characterized as being merely a redundant or
replacement part, it should still be considered part of the
retail set because the secondary battery nevertheless enhances
the fulfillment of the particular need of unplugged computing.
The Government responds by arguing that there is only one
"particular need" satisfied by a notebook computer/battery

combination – the ability to portably compute – and that this is fully met by the computer, the power cord, and the primary battery which are prepackaged together. According to the Government, the inclusion of the secondary battery exceeds the reasonably intended purpose of the notebook, which was already satisfied by the inclusion of the primary battery and power cord.

The plain language of Criterion (b) supports Dell's position that the inclusion of the secondary battery with the notebook computer meets a "particular need" or carries out a "specific activity." Even though the Government argues that the reasonably intended purpose of the computer is already met; Criterion (b) does not require a retail set component to satisfy a different need than those met by other components. Criterion (b) only requires that the component satisfies a "particular" need. See Criterion (b). Furthermore, the Government does not dispute Dell's argument that a component of a "retail set" need not be essential to the use of the primary article for its intended purpose. See, e.g., HQ 078445 (Apr. 18, 1989) (ruling that a camera and multiple lenses were components of a retail set). Here, the secondary battery exists as a supplemental component that meets the particular need of prolonged unplugged computing by extending the time a computer can function without a power adapter.

In addition, the ENs do not require that all components of a retail set can be used simultaneously or that replacements

parts are _de jure_ excluded from consideration as components of retail sets.  Thus, the subject batteries are not precluded from classification as a component of a retail set even if the need they fulfill is considered redundant with the need fulfilled by the primary battery.  Dell's position that the secondary battery meets a "particular need" or carries out a "specific activity," thus, appears to be sustainable.  There are, however, further considerations in order to satisfy Criterion (b).

Under Criterion (b), the subject merchandise must be _put up together_ with the other components of the set in order to meet a particular need or carry out a specific activity.  The dictionary definition of "put up" includes "to offer for public sale."  _Webster's Third New International Dictionary of the English Language Unabridged_ 1851 (Philip Babcock Grove, Ph. D. ed., Merriam-Webster Inc., Publishers 2002)(1961)("_Webster's Dictionary_").[14]  As Customs notes in HQ 967364, "put up" also is defined as to "construct" or "erect" and to "display" or "show." HQ 967364 (Dec. 23, 2004); _see_ _also_ _Webster's Dictionary_ at 1851. Criterion (b) in the ENs is meant to assist in interpreting GRI 3(b) which refers to goods "put up in sets _for retail sale_."  GRI 3(b), HTSUS (emphasis added).  It is therefore reasonable to interpret "put up," in the context of Criterion (b) and GRI 3

---

[14] The Government also argues for this definition of "put up" in its interpretation of EN Criterion (c) to GRI 3(b).

(b), to mean offered together for retail sale or displayed or shown together for retail sale.

The subject batteries are not offered or displayed together for retail sale with the computer – the computer is offered together with a power cord and primary battery, and the secondary batteries are offered individually. The subject batteries are simply one of many optional, complementary items that may be purchased at the same time as a notebook computer.[15] Although Dell may offer, or even suggest additional items to a customer, it does not necessarily follow that the items selected by a customer are "put up together." GRI 3(b), HTSUS.[16]

Therefore, while the language of Criterion (b) supports Dell's position that the inclusion of the secondary battery with the notebook computer meets a "particular need" or carries out a "specific activity;" the subject batteries nevertheless fail to satisfy Criterion (b) because they were not "put up together"

_____

[15] See HQ 964209 (Sept. 14, 2001)(determining that Dell speakers fail to meet Criterion (b) "because the components are not 'put up together.' Each grouping is made to order so that no identifiable specific activity is met for all groupings . . . Therefore, the speakers may not be considered part of a 'set' pursuant to GRI 3(b)."

[16] Dell points out rulings where multiple identical goods or replacement parts used with the same primary good were together classified as a "set." See, e.g., NY N027960 (June 5, 2008) (extra erasers and extra lead packaged together for resale with the primary good, propelling pencils, in a plastic box); NY G83666 (Nov. 17, 2000) (yo-yo and replacement yo-yo string packaged and classified together); HQ 085487 (Sept. 27, 1989) (athletic shoes and three pairs of shoe lacings in the same packing container). However, in these rulings, each specific collection of goods was offered and sold together as a single, fixed unit.

with other components of the retail set, as the terms are used for tariff purposes.  See GRI 3(b), HTSUS; Criterion (b).  Dell fails to show that the computer, with a power cord and a primary battery encased, and the secondary battery were put up together to meet the particular need or carry out the specific activity of extended unplugged computing.

### ii.   Whether the packages containing the secondary batteries are "put up in a manner suitable for sale directly to users without repacking."

Based in part on similar reasoning, the secondary batteries fail to satisfy Criterion (c) which describes a retail set as goods "put up in a manner suitable for sale directly to users without repacking (e.g., in boxes or cases or on boards)." ENs, GRI 3(b), (X)(c), HTSUS ("Criterion (c)").

Dell's position focuses on the fact that the subject batteries were "put up" or "packaged" with the notebook computer in the FTZ before entering into the commerce of the United States and delivered to retail customers.  Dell argues that merchandise does not need to be packaged together before offered for sale in order to satisfy Criterion (c), noting that Customs has consistently classified goods as GRI 3(b) retail sets without inquiring into the sequence of ordering and packaging.  True, the chronology of packaging the secondary battery and the computer together after a customer places an order does not in itself negate classification as a GRI 3(b) retail set.  However, Dell's

argument overlooks other relevant requirements for merchandise
exiting a FTZ to comprise a GRI 3(b) retail set.

Even if the phrase "put up," as used in Criterion (c),
is defined as "placed in a container or receptacle," as Dell
contends, Criterion (c) must be read in reference to GRI 3(b)
since the purpose of the ENs is to aid in the interpretation of
the GRIs.  See Webster's Dictionary at 1851.  As previously
discussed, GRI 3(b) refers to "goods put up in sets for retail
sale."  GRI 3(b), HTSUS.  The language of GRI 3(b) indicates that
there is an identifiable collection of goods comprising a set
that is put up for the purpose of a potential retail sale.  See
id.  The requirement that a set be "put up" or "placed in a
container," in a manner suitable for sale without repacking does
not nullify the language of GRI 3(b) which indicates that there
is an express set of goods comprising a set prior to the
potential retail sale.  See Criterion (c).

In this case, the batteries at issue were never put up
for sale as part of a fixed grouping of goods by Dell or its
suppliers – they were simply offered for sale individually.  A
customer could purchase one or more secondary batteries, along
with various other supplemental items, when simultaneously
purchasing a notebook computer.  Dell then packaged the
additional optional items into a shipping box that already
contained the notebook computer, a primary battery, and a power
cord.  Despite the fact that the subject batteries were packaged

together with notebook computers, the shipments to Dell's customers were never put up by Dell as sets prior to a potential retail sale.  See GRI 3(b), HTSUS.

Dell's position would permit goods packaged together to be classified a "set" for tariff purposes even if the grouping of goods was not fixed when offered for sale.  This result would nullify the language of GRI 3(b) which anticipates a set as a defined unit that is offered for sale to retail consumers.  Here, the contents of a customized order are determined by an individual customer; Dell did not designate which merchandise constituted a set for retail sale.

This is not to suggest that simply marketing or offering items together inherently creates a "retail set" for tariff purposes.  Rather, this court is stating that a consumer's customized order of individual, complementary items, (i.e. items that were never put up together as a pre-determined combination), is not transformed into a GRI 3(b) "retail set" upon entry merely by virtue of being ordered at the same time and subsequently packaged together in an FTZ.

Furthermore, it is not clear that the subject batteries satisfy the Criterion (c) requirement that the collection of goods, in its condition as shipped, is "suitable for retail sale without repacking."  See Criterion (c).  One definition of "suitable" is "adapted to a use or purpose."  See Webster's Dictionary at 2286.  The purpose here is a potential retail sale.

See Criterion (c).  Criterion (c) therefore describes a set of goods that is put up in a manner that would allow for retail sale without repacking.

Dell acknowledges that other optional items simultaneously ordered by a customer may leave the FTZ in the same package as the computer and subject battery.  Thus, the collections of goods in each package vary according to each customer's specifications.  The customization of each order undermines the conclusion that each package, when it exits the FTZ, is "suitable for retail sale without repacking."  See Criterion (c).

Accordingly, the subject secondary batteries are neither classifiable as part of a GRI 3(b) retail set nor as a functional unit of the notebook computer pursuant to GRI 1. Classifying the subject batteries separately from the computer also is consistent with previous Customs rulings classifying secondary or redundant power sources separately from the primary article entered for consumption.  See, e.g., NY N052216 (Apr. 2, 2009) (classifying a heating vest, a removable battery, and a power charger with a cord together under the subheading for the heating vest, the article imparting the essential character, while optional spare batteries and chargers purchased simultaneously were classified separately under subheading 8507.80.80, HTSUS, as "electric storage batteries: other"); NY L857508 (Oct. 6, 2005) (classifying an additional battery under

subheading 8507.80.80, HTSUS, as "electric storage batteries,"
separate from the classification of the other four components in
a RAID500-RK (Redundant Array of Independent Disks) subsystem);
NY J89374 (Oct. 8, 2003)(classifying a cordless drill, the
battery housed in its base, and other drill components together
as a GRI 3(b) set under the subheading for the drill while the
extra rechargeable battery imported in the same retail packaging
as the drill was classified separately under subheading
8507.30.8010, HTSUS as "other electric storage batteries").[17]

### IV. CONCLUSION

For the foregoing reasons, the Court upholds Customs'
classification of the subject merchandise under subheading
8507.80.80, HTSUS.  Plaintiff's motion for summary judgment is
denied and Defendant's cross-motion is granted.

/s/ Richard W. Goldberg
_____
**Richard W. Goldberg
Senior Judge**

**Date:       June 10, 2010
            New York, New York**

---

[17] Dell errs in arguing that this final Customs ruling, NY
J89374 (Oct. 8, 2003), has no precedence because at issue was a
radio charger kit, not the extra battery. Customs' ruling that
the radio kit was not classifiable as part of the set did not
preclude Customs from ruling that other components, such as the
power cord and the primary battery, were part of a set with the
drill.