# United States Court of Appeals for the Federal Circuit

05-1482

CUMMINS INCORPORATED
(formerly known as Cummins Engine Company),

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Lawrence M. Friedman, Barnes, Richardson & Colburn, of Chicago, Illinois, argued for plaintiff-appellant. With him on the brief were David G. Forgue and Ilya A. Bakke.

Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice, of New York, New York, argued for defendant-appellee. With her on the brief were Peter D. Keisler, Assistant Attorney General, and David M. Cohen, Director, of Washington, DC. Of counsel on the brief was Beth C. Brotman, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, of New York, New York.

Appealed from: United States Court of International Trade

Judge Donald C. Pogue

# United States Court of Appeals for the Federal Circuit

05-1482

CUMMINS INCORPORATED
(formerly known as Cummins Engine Company),

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  July 17, 2006

_____

Before NEWMAN, MAYER, and RADER, Circuit Judges.

MAYER, Circuit Judge.

Cummins Inc. appeals the United States Court of International Trade's grant of summary judgment, which held that the crankshafts imported by Cummins into the United States did not originate in Mexico and were not entitled to preferential treatment under the North American Free Trade Agreement ("NAFTA").  Cummins Inc. v. United States, 377 F. Supp. 2d 1365 (Ct. Int'l Trade 2005).  We affirm.

## Background

Under the United States' tariff laws, products that "originate in the territory of a NAFTA party" are entitled to preferential duty treatment.  General Note 12(a)(ii), Harmonized Tariff Schedule of the United States ("HTSUS"); see also 19 U.S.C. § 3332 (2000).  One way a product may so originate is if it is "transformed in the territory" of a

NAFTA party. General Notes 12(b)(i)–(iv), HTSUS. One manner in which a good can be transformed, as is relevant to this case, is by undergoing a "change in tariff classification" "to subheading 8483.10 from any other heading." General Notes 12(b)(ii)(A),12(t)/84.243(A), HTSUS. Here, Cummins contends that the crankshafts it imports into the United States undergo such a tariff shift in Mexico from heading 7224 to subheading 8483.10.30, and are thereby entitled to preferential duty treatment.

The facts surrounding the production of the crankshafts are undisputed. Production begins in Brazil, where Krupp Metalurgica Campo Limpo creates a forging having the general shape of a crankshaft. This forging is created from a closed-die forging process, which involves forging alloy steel between matrices. After forging, the excess material that was squeezed out of the matrices, called "flash," is removed by a process called trimming. The trimming is done on a separate machine within approximately ten seconds of the forging press operation. Because the process of trimming can distort the forging, the forging is then coined. Coining involves applying pressure to the forging, which is still hot and malleable, in a closed die. After coining, the forging is subjected to shot blasting. Shot blasting uses abrasive particles to strike the surface of the forging to remove dirt and oxide from its surface. The forging is then cooled, and its ends are milled so that it can be securely clamped into machines in Mexico for final machining operations. The last manufacturing process performed in Brazil is mass centering, in which the forging's center of balance is determined and locator center points are machined into each end.

After these processes are performed in Brazil, the forging is imported into Mexico by Cummins de Mexico, S.A. ("CUMMSA"), a wholly owned subsidiary of Cummins. As

05-1482                                    2

imported, the forging has the general shape of, but cannot yet function as, a crankshaft. After importation into Mexico, CUMMSA performs at least fourteen different steps on the forging that cover over 95% of its surface area resulting in a useable crankshaft, which Cummins imports into the United States. It is undisputed that the crankshaft imported into the United States is classifiable under subheading 8483.10.30 of the HTSUS, which covers "[t]ransmission shafts (including camshafts and crankshafts) and cranks . . . ."

The Court of International Trade addressed nearly identical facts in an earlier case involving the same crankshafts. Cummins Engine Co. v. United States, 83 F. Supp. 2d 1366 (Ct. Int'l Trade 1999) ("Cummins I"). The crankshaft manufacturing process there was nearly identical to the one here, except that a grease pocket was milled into the forging in Brazil. The court held that machining the grease pocket in Brazil precluded classification under heading 7224 upon importation in Mexico, because it was further working the product beyond roughly shaping it by forging.

After Cummins I, Cummins filed for an amended advance ruling letter from the United States Customs and Border Protection ("Customs"), based on the grease pocket being machined in Mexico instead of Brazil. Despite the change in the manufacturing process, Customs determined that the crankshafts did not originate in Mexico. Crankshafts Processed in Mexico from Forgings of Brazilian Origin; Originating Goods Under NAFTA, Ruling 964019 (Dec. 13, 2000). Prior to issuing its decision, Customs submitted the question to the World Customs Organization ("WCO"), which issued a classification opinion, approved by the member states 31 to 1, determining that the proper classification of the forgings imported into Mexico was under heading 8483, not heading 7224. Classification of Certain Forgings for Crank Shafts, Doc. No. NC0317E1

(Oct. 10, 2000), available at <u>Amendments to the Compendium of Classification Opinions</u>

<u>Arising from the Classification of Certain Forgings for Crank Shafts in Subheading</u>

<u>8483.10</u>, Doc. No. NC0379E1 at 3 (March 8, 2001).  However, Customs did not

expressly rely upon the WCO decision in denying Cummins preferential treatment.

In response to Customs' advance letter ruling, Cummins filed an action in the

Court of International Trade under 28 U.S.C. § 1581(h).[1]  While that action was

pending, Cummins imported into the United States a test shipment of three finished

crankshafts marked as originating in Mexico, which Customs classified under

subheading 8483.10.30, HTSUS.  Cummins protested this classification, arguing that

the proper classification was (MX)8483.10.30.[2]  After protesting Customs' classification

of the test shipment, Cummins filed an action under 28 U.S.C. § 1581(a).  The trial court

consolidated the two actions, but later found the section 1581(h) action moot in light of

the one under section 1581(a).

The court determined on summary judgment that the articles imported into

Mexico were properly classified under subheading 8483.10.30, not heading 7224, and

accordingly did not undergo a tariff shift and were not entitled to preferential treatment

under NAFTA.  Cummins appeals the trial court's grant of summary judgment, and we

have jurisdiction under 28 U.S.C. § 1295(a)(5).

---

[1]    Under 28 U.S.C. § 1581(h), the Court of International Trade may review pre-importation Customs' rulings if the party commencing the action demonstrates that "he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation."

[2]    The prefix "MX" signifies that the article is a product of Mexico, and is accorded preferential treatment pursuant to NAFTA.

<u>Discussion</u>

We review the trial court's grant of summary judgment on tariff classifications <u>de novo</u>. <u>Gen. Elec. Co. – Med. Sys. Group v. United States</u>, 273 F.3d 1070, 1071 (Fed. Cir. 2001) (citation omitted). A classification decision involves two underlying steps: determining the proper meaning of the tariff provisions, which is a question of law; and then determining which heading the disputed goods fall within, which is a question of fact. <u>Universal Elecs. v. United States</u>, 112 F.3d 488, 491 (Fed. Cir. 1997) (citing <u>Intel Sing., Ltd. v. United States</u>, 83 F.3d 1416, 1417-18 (Fed. Cir. 1996)). However, when the nature of the merchandise is undisputed, as it is here, the classification issue collapses entirely into a question of law. <u>Gen. Elec. Co.</u>, 273 F.3d at 1071 (citing <u>Bausch & Lomb, Inc. v. United States</u>, 148 F.3d 1363, 1366 (Fed. Cir. 1998)). Although our review is <u>de novo</u>, we accord deference to a Customs' classification ruling in proportion to its "power to persuade" under the principles of <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944). <u>United States v. Mead Corp.</u>, 533 U.S. 218 (2001); <u>Mead Corp. v. United States</u>, 283 F.3d 1342, 1345-46 (Fed. Cir. 2002) (citations omitted). In addition, "Customs' relative expertise in administering the tariff statute often lends further persuasiveness to a classification ruling, entitling the ruling to a greater measure of deference." <u>Mead Corp.</u>, 283 F.3d at 1346.

It is undisputed that the crankshafts imported into the United States are properly classified under subheading 8483.10.30. The disputed issue is whether the crankshafts undergo a tariff shift in Mexico. That is, do the crankshafts enter Mexico under a different tariff heading than they leave Mexico? The trial court concluded that the crankshafts do not undergo a tariff shift as they are classified under subheading

8483.10.30 upon import into and export out of Mexico. Cummins contends that this classification was error, and the proper classification of the product upon import into Mexico is under heading 7224, which covers "[o]ther alloy steel in ingots or other primary forms; semifinished products of other alloy steel."

"The General Rules of Interpretation (GRI) govern the classification of goods within the HTSUS." Hewlett-Packard Co. v. United States, 189 F.3d 1346, 1348 (Fed. Cir. 1999). Under GRI 1, the classification "shall be determined according to the terms of the headings and any relevant section or chapter notes." As noted above, Cummins contends that the goods imported into Mexico are properly classified as "semifinished products of other alloy steel" under heading 7224. Chapter 72's notes expressly define "semifinished," in pertinent part, as "products of solid section, which have not been further worked than . . . roughly shaped by forging, including blanks for angles, shapes or sections." Chapter 72, Note 1(ij), HTSUS. Thus, if the product imported into Mexico has been further worked beyond being roughly shaped by forging, it does not fall within heading 7224. The parties dispute the meaning of the term "further worked."

Cummins relies on Additional U.S. Note 2 to Chapter 72, which defines "further worked" as subjecting the product to one of several expressly listed surface treatments.[3]

---

[3] Additional U.S. Note 2 to Chapter 72, HTSUS provides:
> For the purposes of this chapter, <u>unless the context provides otherwise</u>, the term "<u>further worked</u>" refers to products subjected to any of the following surface treatments: polishing and burnishing; artificial oxidation; chemical surface treatments such are [sic] phosphatizing, oxalating and borating; coating with metal; coating with nonmetallic substances (e.g., enameling, varnishing, lacquering, painting, coating with plastics materials); or cladding.

(first emphasis added).

05-1482                                        6

It is undisputed that none of these surface treatments are performed in Brazil, and Cummins contends that so long as none of these specific operations are performed prior to importation into Mexico, the product has not been "further worked." The trial court rejected this argument in Cummins I, and we do so now.

The definition of "further worked" in Chapter 72 is expressly inapplicable where "the context provides otherwise." Here, to read the term "further worked" as referring to only these specific treatments would lead to a nonsensical result. In particular, this definition would render the phrase "than . . . roughly shaped by forging" meaningless and contravene the well-established principle that a statute should be construed "if at all possible, to give effect and meaning to all the terms." Bausch, 148 F.3d at 1367.

Absent an applicable express definition or contrary legislative intent, we must construe the term "further worked" "according to [its] common and commercial meanings, which are presumed to be the same." Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999) (citing Simod Am. Corp. v. United States, 872 F.2d 1572, 1576 (Fed. Cir. 1989)). Here, the plain meaning of "further worked," when read in context, means working the product beyond the point of roughly shaping it by forging. The trial court, relying in part on Winter-Wolff, Inc. v. United States, 996 F. Supp. 1258, 1265 (Ct. Int'l Trade 1998) (construing "further worked" in the context of subheading 7607.11.30), defined "further worked" more precisely as "to form, fashion, or shape an existing product to a greater extent." We agree that this definition is suitable in the context before us.

Here, the product was forged and then trimmed, coined, shot blasted, milled, and mass centered in Brazil. Cummins suggests that these are steps within the "forging

process." However, the relevant language is not "further worked beyond the forging process" but "further worked than roughly shaped by forging." The government cites evidence that the act of forging is understood in the industry as being distinct from the additional operations performed by Cummins in Brazil. In particular, the Forging Handbook provides that trimming occurs "[u]pon completion of the forging operation." Forging Handbook Forging Industry Association, Forging Handbook 153 (Thomas G. Byrer 1985). This handbook also describes coining as a "finishing operation." Id. at 155; see also Product Design Guide for Forging 110, 140 (Forging Indus. Assoc.) (describing coining as a "finishing operation" to improve dimensional accuracy and expressly defining it as a "post-forging" process). Significantly, Cummins agreed that trimming (and hence every step thereafter) takes place "after forging." Moreover, milling the ends of the forging product is outside of the forging process and constitutes working the product beyond roughly shaping it by forging, namely forming, fashioning, or shaping it to a greater extent. Thus, the product imported into Mexico from Brazil cannot be classified under heading 7224.

Although the Explanatory Notes to the HTSUS are not controlling, see, e.g., Rocknel Fastener, Inc. v. United States, 267 F.3d 1354, 1360 (Fed. Cir. 2001), Cummins relies on them in arguing that the goods imported into Mexico are only rough forgings. In particular, Cummins relies upon an Explanatory Note to heading 72.07, which applies mutatis mutandis to heading 7224.[4] Based on this note, Cummins

---

[4] The Explanatory Note to heading 7207 provides the following discussion under the caption "pieces roughly shaped by forging":
> These are semi-finished products of rough appearance and
> large dimensional tolerances, produced from blocks or ingots
> by the action of power hammers or forging presses. They

contends that the product imported into Mexico requires considerable further shaping, and has therefore only been roughly shaped by forging without being further worked in Brazil. As noted above, however, the evidence supports that "forging" is a discrete process from the additional steps performed in Brazil, and the forged product was further worked in Brazil.

We agree with the trial court that the forging is properly classified under heading 8483 upon importation into Mexico. GRI 2(a) provides that "[a]ny reference in a heading to an article shall be taken to include a reference to that article incomplete or unfinished, provided that, as entered, the incomplete or unfinished article has the essential character of the complete or finished article." GRI 2(a), HTSUS. In addition, the Explanatory Notes to GRI 2(a) provide that this rule applies "to blanks unless these are specified in a particular heading. The term 'blank' means an article, not ready for direct use, having the approximate shape or outline of the finished article or part, and which can only be used, other than in exceptional circumstances, for completion into the finished article . . . ." Explanatory Note II to GRI 2(a). Here, the product imported into Mexico had the general shape of a crankshaft and was intended for use only in

---

> may take the form of crude recognisable shapes in order that the final article can be fabricated without excessive waste, but the heading covers <u>only</u> those pieces which require considerable further shaping in the forge, press, lathe, etc. The heading would, for example, cover an ingot roughly hammered into the shape of a flattened zig-zag and requiring further shaping to produce a marine crankshaft, but would <u>not cover</u> a crankshaft forging ready for final machining. The heading similarly <u>excludes</u> drop forgings and pressing produced by forging between matrices since the articles produced by these operations are ready for final machining.

Explanatory Note to Heading 72.07 (emphasis in original).

producing a finished crankshaft. In fact, certain operations done in Brazil, such as milling the forgings' ends, were done solely to simplify the operations in Mexico in completing the crankshaft. As such, the forged product imported into Mexico was properly classified under subheading 8483.10.30. Accordingly, it did not undergo a tariff shift and was not entitled to preferential treatment under NAFTA when imported into the United States.

Finally, Cummins contends that the trial court erred by improperly relying upon the WCO classification opinion. While such an opinion is not given deference by United States courts, it can be consulted for its persuasive value, if any. Cf. Sanchez-Llamas v. Oregon, 548 U.S. ___, Nos. 04-10566, 05-51, slip op. at 17-21 (June 28, 2006) (rejecting the argument that U.S. courts are obligated to comply with interpretations of the Vienna Convention by the International Court of Justice ("ICJ")); Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343, 1349 (Fed. Cir. 2005) (observing that World Trade Organization decisions are accorded no deference); Timken Co. v. United States, 354 F.3d 1334, 1343-44 (Fed. Cir. 2004). The Supreme Court has rejected any notion of deference or obligation to a foreign tribunal's decisions. In so doing, it observed, "If treaties are to be given effect as federal law under our legal system, determining their meaning as a matter of federal law 'is emphatically the province and duty of the judicial department,' . . . ." Sanchez-Llamas, slip op. at 19 (quoting Marbury v. Madison, 1 Cranch 137, 177 (1803)). Like the ICJ's interpretation of the treaty terms in Sanchez-Llamas, the WCO opinion is not binding and is entitled, at most, to "respectful consideration." Id. It is not a proxy for independent analysis.

05-1482                                  10

Here, the court accorded no deference to either the WCO opinion or the categorization by Mexico's Customs authority. Instead, it independently construed "further worked," based solely on the tariff terms and the principles set forth in the GRIs, and consulted the WCO opinion and Mexican categorization only as persuasive authority. The court properly construed the statutory terms as they are written. See Corus Staal, 395 F.3d at 1349; cf. Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 668 (Fed. Cir. 1992) ("While we acknowledge Congress's interest in complying with U.S. responsibilities under the GATT, we are bound not by what we think Congress should or perhaps wanted to do, but by what Congress in fact did.").

## Conclusion

Accordingly, the judgment of the United States Court of International Trade is affirmed.

### AFFIRMED