# United States Court of Appeals
## for the Federal Circuit

---

**LEMANS CORPORATION,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2010-1295

---

Appeal from the United States Court of International Trade in case no.06-CV-0038, Judge Judith M. Barzilay.

---

Decided: October 3, 2011

---

JESSICA R. RIFKIN, Rodriguez O'Donnell Gonzalez & Williams, P.C., of Chicago, Illinois, argued for plaintiff-appellant. With her on the brief were THOMAS J. O'DONNELL and RODRIGUEZ O'DONNELL.

ALEXANDER VANDERWEIDE, Trial Attorney, International Trade Field Office, Civil Division, United States Department of Justice, of New York, New York, argued for defendant-appellee. With him on the brief were BARBARA S. WILLIAMS, Attorney in Charge; and TONY WEST, Assistant Attorney General, and JEANNE E. DAVIDSON, Director, Civil Division, Commercial Litigation

Branch, United States Department of Justice, of Washington, DC. Of counsel on the brief was MICHAEL W. HEYDRICH, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs and Border Protection, New York, New York.

---

Before GAJARSA,[*] MAYER, and O'MALLEY, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

This is a trade case in which we are required to assess the propriety of merchandise classifications employed by United States Customs and Border Protection ("Customs") when setting duty rates on certain products imported into the United States by LeMans Corporation ("LeMans"). LeMans appeals the decision of the Court of International Trade ("CIT") upholding Customs' classification of LeMans's motocross jerseys, motocross pants, and motorcycle jackets (collectively, the "subject merchandise") as apparel under Chapters 61 and 62 of the Harmonized Tariff Schedule of the United States ("HTSUS"). LeMans contends that the subject merchandise should be classified as sports equipment under Chapter 95 of the HTSUS because the articles are necessary, useful, or appropriate for a sport and are specifically designed for use in a particular sport. Because we find that Customs correctly classified the subject merchandise as apparel and, thus, properly set duty rates for these LeMans imports, we affirm.

---

[*] Judge Gajarsa assumed senior status on July 31, 2011.

BACKGROUND

A.   The Subject Merchandise

LeMans imported the subject merchandise into the United States through the ports of Chicago and Los Angeles between July 20, 2004 and September 17, 2004. The merchandise consists of: (1) five different models of motocross jerseys; (2) six different models of motocross pants; and (3) four different models of motorcycle jackets. The differences in the specific models are neither significant nor relevant for this analysis, and we treat the merchandise in three broad categories: motocross jerseys, motocross pants, and motorcycle jackets.   Below are the relevant features of each of the categories of articles as found by the CIT and according to the record, which are not in dispute:[1]

1.   Motocross Jerseys

LeMans's motocross jerseys are made of "[s]ynthetic, abrasion-resistant mesh and ventilated knit patterned fabric, which also wicks away moisture." *LeMans Corp. v. United States*, 675 F. Supp. 2d 1374, 1376-77 (Ct. Int'l Trade 2010) ("*CIT Decision*").   They have "padded elbows for abrasion and impact protection and form an integrated protection system with the use of a tacky silicon print on the lower back to keep the jersey tucked into the motocross pant when riding." *Id.* at 1377 (internal quotations and citation omitted).   The record shows that the weight of the pads constitutes approximately ten percent of the entire weight of the jersey.

---

[1]   At LeMans's suggestion, this court obtained and examined physical samples of the products LeMans submitted to the CIT in connection with its summary judgment motion.

### 2.   Motocross Pants

LeMans's motocross pants are made of

[h]eavy-duty nylon [that] provides riders with impact and abrasion protection, and the pants contain additional comfort features, such as mesh panels for venting, heat resistant inner leg areas (made of leather or man-made fibers) to prevent burns from the engine and exhaust pipe, and spandex and stretch panels to allow freedom of movement and a non-binding fit in the legs, seat, and crotch area.

*Id.* at 1377 (internal quotations and citations omitted). The pants contain foam padding sewn into the knee and thigh areas as well as removable foam padding. The weight of the pads is just less than fifty percent of the total weight of the pants.

### 3.   Motorcycle Jackets

The jackets are made of "[h]eavy-duty materials," such as heavyweight waxed cotton chassis, Dynax Nylon chassis, or knitted polyester mesh chassis, and contain molded rubber padding inserted into the elbows and shoulders as well as back pads. *Id.* at 1377-78 n.6. They are intended to provide protection to riders on public streets from impact and abrasion injuries that may occur in an accident during street motorcycle riding. *Id.* The protectors in the jackets comprise roughly twenty to twenty-five percent of the weight of the jackets.

### B.  Customs' Classification

Customs classified all of the subject merchandise as wearing apparel under either Chapter 61 or 62 of the

HTSUS.[2]  Specifically, Customs classified the motocross jerseys as "Sweaters, pullovers, sweatshirts, waistcoats (vests) and similar articles, knitted or crocheted: Of man-made fibers: Other" under subheading 6110.30.30 of the HTSUS at a duty rate of 32% *ad valorem*.  It classified the pants as "Garments, made up of fabrics of heading 5602, 5603, 5903, 5906 or 5907: Other men's or boys' garments: Of man-made fibers: Other" under subheading 6210.40.50 of the HTSUS at a duty rate of 7.1% *ad valorem*.  And it classified the different models of motorcycle jackets in three separate provisions of Heading 6201 of the HTSUS: the Airtex Sport and Merc models under subheading 6201.93.30 (7.1% *ad valorem*); the Tarmac jacket under 6201.93.35 (27.7% *ad valorem*); and the Super Duty model under 6201.92.15 (6.2% *ad valorem*).

LeMans filed timely protests, claiming that its merchandise is properly classifiable under Chapter 95 of the HTSUS, either under subheading 9506.91.0030 at a duty rate of 4.6% *ad valorem*, or under subheading 9506.99.6080 at a duty rate of 4% *ad valorem*.  Customs denied the protests.

C.  Court of International Trade Decision

LeMans initiated a civil action in the CIT contesting the denial of its protest under 19 U.S.C. § 1515.  Following cross-motions for summary judgment, the CIT issued a decision affirming Customs' classification as to all goods.  It did so under General Rule of Interpretation ("GRI") 1, which requires review of the headings and relevant section and chapter notes of the HTSUS.  *CIT Decision*, at 1385.

---

[2]    All citations to the HTSUS refer to the 2004 version, as determined by the date of importation of the merchandise.

As for the jerseys, the CIT looked to the common dictionary definition of "sweater" and "pullover" and the Headings of 6110 to determine that the jerseys fit within the definition of those terms. *Id.* at 1380-81. It also reviewed the Explanatory Notes to Heading 6110 ("EN 61.10"), which add that the heading encompasses "a category of knitted or crocheted articles . . . designed to cover the upper parts of the body," specifically including "jerseys" as an example. *Id.* at 1381 (quoting EN 61.10).

As for the pants, the CIT again looked to the common dictionary definition of "garment" to find that LeMans's motocross pants constitute an article of clothing that covers the human body, and that the pants are made up of materials under headings 5903 and 5906 (heavy duty nylon mesh, heavy duty ballistic woven nylon fabric, heavy duty woven polyester, and Keprotec®). *Id.* at 1381-82. Finally, the court affirmed Customs' classification of LeMans's motorcycle jackets as "overcoats," finding that they fit within that general category and distinguishing them from "men's or boys' suits" under Heading 6203. *Id.* at 1382.

The CIT also rejected LeMans's argument that its goods are *prima facie* classifiable as sports equipment under Heading 9506, which would require consideration of GRI 3(a) to determine which heading more specifically describes the merchandise. The court looked to the dictionary definition of "equipment" and our decision in *Rollerblade, Inc. v. United States*, 282 F.3d 1349, 1354 (Fed. Cir. 2002), in which we stated that "'equipment' includes those articles that are necessary and specifically designed for use in athletics and other sports." *Id.* at 1354. Based on these authorities and its review of the subject merchandise, the court found that, although LeMans's goods "arguably constitute[] useful, if not necessary, articles to motocross and motorcycle riding," the

Explanatory Notes to Heading 9506 ("EN 95.06") demonstrate that the subject merchandise is not of the type typically classified as sports equipment. *CIT Decision*, at 1383-84. Those notes include, as examples of "requisites for other sports," items such as snow skis, golf clubs, ping-pong paddles, tennis rackets, basketballs, ice skates, hockey sticks, swings, and slides. *See CIT Decision*, at 1383 n.15 (citing EN 95.06(B)). Although example (B)(13) of the Explanatory Notes identifies "[p]rotective equipment for sports or games, e.g., fencing masks and breast plates, elbow and knee pads, cricket pads, shin-guards," the court found that these examples "center on non-clothing articles and do not describe apparel like the subject merchandise." *Id.* at 1383-84.

The court further found that Note 1(e) to Chapter 95, which excludes "sports clothing . . . of textiles, of chapter 61 or 62" from Chapter 95, also supported its conclusion. *Id.* at 1384. Finally, the CIT distinguished our decision in *Bauer Nike Hockey USA, Inc. v. United States*, 393 F.3d 1246 (Fed. Cir. 2004), a case in which we found that ice-hockey pants were classifiable as sports equipment, on grounds that *Bauer* did not provide a broadly applicable definition of "equipment" and involved a GRI 3(a) analysis, not a GRI 1 finding. *CIT Decision*, at 1384-85.

LeMans filed a timely notice of appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

STANDARD OF REVIEW

We review the CIT's grant of summary judgment on tariff classifications de novo. *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006). We employ the same standard employed by the CIT in assessing Customs' classification determinations. A classification decision involves two steps. The first concerns the proper meaning of the tariff provisions, which is a question of

law reviewed de novo. *Id.* The second step concerns whether merchandise falls within a particular heading, which is a question of fact we review only for clear error. *Id.* Where, as here, the nature of the merchandise is undisputed, the inquiry collapses into a question of law we review de novo. *Id.*

## DISCUSSION

As noted above, LeMans urges us to reject Customs' classification of the subject merchandise as wearing apparel. Instead, it asks that we conclude that the merchandise is properly classified as sports equipment under Chapter 95. LeMans contends that, because its goods are so highly specialized for use during motocross or motorcycle riding, the wearing apparel aspects of the merchandise are only incidental to its primary purpose, placing these items outside of the classification as apparel. LeMans asserts, moreover, that there can be no fair debate that the merchandise is both specially designed for and appropriate and useful for a sport, thus rendering it properly classifiable as sports equipment. LeMans argues that, under these facts, our precedent commands reversal of the CIT decision. As explained below, we find that the subject merchandise is properly classified as wearing apparel under Chapters 61 and 62 and is not *prima facie* classifiable as sports equipment under Chapter 95, and we find LeMans' characterization of our precedent overly broad. Accordingly, we conclude that Customs' classification of the subject is not erroneous.[3]

---

[3] Because we decide that the subject merchandise is not *prima facie* classifiable as sports equipment under the proper interpretation of that term, we do not address the government's argument that motorcycle jackets are not classifiable as sports equipment for the independent

The proper classification of merchandise is governed generally by the GRIs of the HTSUS. *Bauer*, 393 F.3d at 1250. GRI 1 requires classification "according to the terms of the headings and any relative section or chapter notes." GRI 1. If GRI 1 resolves the issue, the court is not to look to other GRIs. *See Mita Copystar Am. v. United States*, 160 F.3d 710, 712 (Fed. Cir. 1998). We are first to look to headings, then subheadings, to determine the proper classification. *Bauer*, 393 F.3d at 1250. "Absent contrary definitions in the HTSUS or legislative history, we construe the terms used in the headings and subheadings according to their 'common and popular meaning,' which may be drawn from our 'own understanding, dictionaries and other reliable sources.'" *Id.* (quoting *Medline Indus., Inc. v. United States*, 62 F.3d 1407, 1409 (Fed. Cir. 1995)). The World Customs Organization's Explanatory Notes that accompany each Chapter of the HTSUS, while not legally binding, are "persuasive" and are "generally indicative" of the proper interpretation of the tariff provision. *Drygel, Inc. v. United States*, 541 F.3d 1129, 1134 (Fed. Cir. 2008).

When merchandise is *prima facie* classifiable under two or more headings or subheadings of the HTSUS, we apply GRI 3 to resolve the classification. *Bauer*, 393 F.3d at 1251. GRI 3(a) states that "[t]he heading which provides the most specific description shall be preferred to headings providing a more general description." GRI 3(a). "Under this so-called rule of relative specificity, we look to the provision with requirements that are more difficult to satisfy and that describe the article with the greatest degree of accuracy and certainty." *Orlando Food Corp. v. United States*, 140 F.3d 1437, 1441 (Fed. Cir. 1998).

---

reason that street motorcycle riding, as distinct from motorcycle racing, is not a "sport."

A. Apparel Under Chapters 61 and 62

We first consider whether Customs correctly classified the subject merchandise as various types of apparel under subheadings of Chapters 61 and 62 of the HTSUS. On this point, LeMans does not challenge the definitions the CIT applied to the relevant terms (i.e., "sweater," "pull-over," "garment," and "overcoat"), nor does it challenge whether the subject merchandise falls within the ordinary meaning of those terms generally. Rather, LeMans asserts that the CIT incorrectly concluded that the articles at issue constitute "wearing apparel" because its merchandise is so highly specialized that any apparel-like features are incidental to the subject merchandise's primary purpose as sports equipment.

In support of its argument, LeMans relies on our decision in *Rubie's Costume Co. v. United States*, 337 F.3d 1350, 1357-58 (Fed. Cir. 2003), in which we found that Customs appropriately classified certain costumes as "festive articles" under Chapter 95 rather than as wearing apparel under Chapter 61. That case required us to consider Note 1(e) to Chapter 95, which provides that Chapter 95 does not include "[s]ports clothing or fancy dress, of textiles, of chapter 61 or 62."[4] *See id.* at 1356-57. Pursuant to Note 1(e), if the costumes at issue constituted "fancy dress, of textiles, of chapter 61 and 62," which we held encompassed textile costumes classifiable as "wearing apparel," they would be precluded from classification in Chapter 95. *Id.*

In *Rubie's*, we determined that the costumes at issue were not "wearing apparel," such that they could not be considered articles of "fancy dress" that are excluded from

---

[4]    *Rubie's* concerned the "fancy dress" component of the exclusionary note, but the "sports clothing" portion of the note is relevant here, as discussed below.

Chapter 95. *Id.* In so deciding, we relied on the fact that the costumes were worn only on rare occasions, such as during Halloween or at a costume party, included "one-size-fits-all" varieties, and were "flimsy" and "lacking in durability." *Id.* at 1358. While acknowledging that the category of "wearing apparel" includes clothing "worn for decency or comfort" and "adornment," we found that, to the extent the items at issue in *Rubie's* possessed those features, they were secondary or incidental to the costumes' festive value. *Id.* at 1357-58 (citing *Antonio Pompeo v. United States*, 40 Cust. Ct. 362, 364 (1958)). Unlike the articles in *Rubie's*, the subject merchandise in this case shares more characteristics with ordinary apparel, coming in different sizes and having the durability to be worn repeatedly. In addition, whereas the comfort features of the costumes were secondary, LeMans itself explains that all of the articles at issue here are designed to "provide *optimal fit and comfort* while participating in the sport."[5] Appellant's Br. 8 (emphasis added). For these reasons, we find LeMans's reliance on *Rubie's* misplaced.

The government is correct that the headings and sub-headings of Chapters 61 and 62 do not distinguish between apparel designed for general or specific uses. The fact that articles are specialized or intended for specific purposes, such as for sports, does not alone remove them from the category of apparel. Indeed, Chapter 62 includes heading 6211 for "track suits, ski-suits and swimwear;

---

[5] While we recognize that the ice-hockey pants at issue in *Bauer*, 393 F.3d at 1248, also were designed to provide comfort, fit, and ventilation, that does not change our analysis. We consider these features only as it relates to classification of the subject merchandise as wearing apparel, a question we assumed without deciding in *Bauer*. *Id.* at 1251.

other garments," which are, by their nature, items used in particular athletic activities. It is true, moreover, that "[v]irtually all wearing apparel is to a degree (often a high degree) designed and worn to provide comfort and protection, often for very specific situations." *Daw Indus., Inc. v. United States*, 714 F.2d 1140, 1143 (Fed. Cir. 1983). Despite LeMans's argument to the contrary, the merchandise in this case does not contain protective or specialized features to the same degree as the "crash helmets" used by motorcycle and auto racers in *Antonio Pompeo,* 40 Cust. Ct. at 366 (finding that "crash helmets" "would not be considered in ordinary parlance to be 'wearing apparel' "). Accordingly, because we find that the CIT correctly applied the dictionary definitions of the terms in the headings and subheadings and then correctly concluded that the subject merchandise was wearing apparel, we agree that Customs properly classified LeMans's goods under Chapters 61 and 62 of the HTSUS.

## B.  Sports Equipment under Chapter 95

LeMans contends that, even if the subject merchandise is properly classifiable as apparel, it is also *prima facie* classifiable as sports equipment, which requires resort to the guidelines set forth in GRI 3(a) to determine which heading provides the most specific description. According to LeMans, a GRI 3(a) analysis requires classification of its goods under Heading 9506, which provides for "[a]rticles and equipment for general physical exercise, gymnastics, athletics, others sports," rather than headings 6110, 6201, and 6210. As discussed below, because we disagree that the subject merchandise is *prima facie* classifiable as sports equipment, we resolve this matter under GRI 1 and do not consider LeMans's argument under GRI 3(a).

### 1.  "Sports equipment"

The term "sports equipment" is not defined in the HTSUS, so we are to look to the common and popular meaning of the term.  *Bauer*, 393 F.3d at 1250.  Here, the CIT correctly cited the dictionary definition of "equipment" to find that "[t]o qualify as 'equipment' for a sport, the good should generally provide 'what is necessary, useful, or appropriate [for that sport].'"  *CIT Decision*, at 1383 (citing *Webster's Third New International Dictionary* 768 (2002)).

We have employed this same definition for the term "sports equipment" in our prior decisions.  *See Rollerblade*, 282 F.3d at 1354; *Bauer*, 393 F.3d at 1250-51.  In *Rollerblade*, we accepted a definition offered for this term that "includes those articles that are necessary and specifically designed for use in athletics and other sports."  282 F.3d at 1354.  In *Bauer*, we again considered the definition of "sports equipment" when we addressed the proper classification for ice-hockey pants.  393 F.3d at 1250-51.  There, we found that the CIT erred in applying our *Rollerblade* decision too strictly when it found that "equipment" meant *only* articles that are *indispensible* to a sport or athletic activity.  Because hockey could be played without ice-hockey pants, the CIT held that such pants were not necessary for that sport and, therefore, not eligible for classification as sports equipment.  *Id.* at 1250.  We reversed, explaining that, while the term "sports equipment" includes items that are *necessary* for a sport, it also includes items that are appropriate and useful for a sport.  *Id.*  We concluded that, "[b]ecause it is undisputed that Bauer's pants were specially designed and intended for use only while playing ice hockey, we hold, contrary to the [CIT's] conclusion, that the pants are *prima facie* classifiable under subheading 9506.99.25 as ice-hockey equipment."  *Id.* at 1251.

Relying on the dictionary definition of "equipment" and our case law, LeMans argues that "sports equipment" means either those goods that are "necessary, useful, or appropriate" for a sport or those goods that are "specially designed and intended for use" in a particular sport, even if they might otherwise be wearing apparel. Appellant's Br. 12. According to LeMans, the subject merchandise falls squarely within either definition, particularly in light of the CIT's statement that the subject merchandise is "designed, engineered, and produced exclusively for use while participating in motocross activities and other power sports riding." *CIT Decision*, at 1376 (quoting Pl.'s Resp. to Def.'s First Interrogs. & Reqs. for Produc.). Under LeMans's theory, the fact that the merchandise is designed exclusively for use in a particular sport should compel the conclusion that the merchandise is *prima facie* classifiable as sports equipment, and the court (and Customs before it) should proceed to an analysis under GRI 3(a) to determine which heading provides greater specificity. We do not agree with LeMans that the analysis is so narrow.

First, we find LeMans's heavy reliance on *Bauer* misplaced. LeMans argues that the CIT's holding in this case is directly at odds with our decision in *Bauer*, which LeMans believes is controlling. As discussed above, *Bauer* turned on whether the CIT was correct in concluding that, in order for articles to be sports equipment, they must be "indispensable" for a sport. 393 F.3d at 1250. The CIT's decision in *Bauer* that the ice-hockey pants were not classifiable as sports equipment hinged entirely on the fact that hockey could be played without such protective pants:

> While the hockey pants provide protection to the wearer, and are specially designed for use in the sport of ice hockey, Plaintiff concedes that it is

possible to engage in the sport of ice hockey without wearing the merchandise in question.    As such, the Court finds that the subject merchandise is not essential or necessary for participation in that sport. Consequently, Plaintiff's ice hockey pants are not articles of sports equipment, and are therefore not classifiable as such.

*Bauer Nike Hockey USA, Inc. v. United States*, 305 F. Supp. 2d 1345, 1357 (Ct. Int'l Trade 2003) (internal citation omitted), *rev'd*, 393 F.3d 1246 (Fed. Cir. 2004).  In deciding that merchandise can be sports equipment as long as the goods are "useful" or "appropriate" for a sport, we did not address the extent to which the Explanatory Notes to Section 9506 clarified the meaning of the term "sports equipment," an issue we find persuasive in this case, as discussed below.

The ice-hockey pants at issue in *Bauer*, moreover, are distinguishable from the subject merchandise.  The ice-hockey pants were constructed of a nylon or polyester textile "shell" and had an internal assembly of hard plastic guards and foam padding.  *Bauer*, 393 F.3d at 1248.  Accordingly, they were much more like the examples of pads and guards listed in EN 95.06(B)(13), the subsection of the Explanatory Notes that the CIT distinguished from the subject merchandise in this case.  Indeed, the plaintiff-appellant in *Bauer* expressly argued, both before the CIT and on appeal to this court, that its ice-hockey pants fell squarely within the range of examples of protective equipment for sports listed in EN 95.06(B)(13).   Thus, despite LeMans's argument to the contrary, we find that *Bauer* does not compel the result LeMans urges.

Next, as discussed below, resort to the Explanatory Notes to Section 9506 supports the conclusion that the

subject items are not classifiable as sports equipment, as LeMans urges.

## 2. Explanatory Notes

As the CIT found, and as the government urges on appeal, the Explanatory Notes to Section 9506 offer helpful guidance in our interpretation of the term "sports equipment." Although Explanatory Notes are not binding, they are persuasive and are "generally indicative" of the proper interpretation of the tariff provision. *Drygel*, 541 F.3d at 1134. "Thus, in past cases we have credited the unambiguous text of relevant explanatory notes absent persuasive reasons to disregard it." *Id.* (citing *Agfa Corp. v. United States*, 520 F.3d 1326, 1330 (Fed. Cir. 2008) and *BASF Corp. v. United States*, 497 F.3d 1309, 1315-16 (Fed. Cir. 2007)).

In this case, the Explanatory Notes to Section 9506 indicate that, to the extent "sports equipment" encompasses articles worn by a user, those articles are not apparel-like and are almost exclusively protective in nature. We agree with the CIT's conclusion that all of the listed examples in Subsection (B) "center on non-clothing articles and do not describe apparel like the subject merchandise." *CIT Decision*, at 1383-84.[6] Example 13,

---

[6]  Subsection B of the Explanatory Notes to Heading 9506 states that Heading 9506 covers requisites for other sports, such as:

(1) Snow-skis and other snow-ski equipment, (e.g., ski-fastenings (ski-bindings), ski brakes, ski poles).

(2) Water-skis, surf-boards, sailboards and other water-sport equipment, such as diving stages (platforms), chutes, divers' flippers and respiratory masks of a kind used without oxygen or compressed air bottles, and simple underwater breathing tubes (generally known as "snorkels") for swimmers or divers.

(3) Golf clubs and other golf equipment, such as golf balls, golf tees.

(4) Articles and equipment for table-tennis (ping-pong), such as tables (with or without legs), bats (paddles), balls and nets.

(5) Tennis, badminton or similar rackets (e.g., squash rackets), whether or not strung.

(6) Balls, other than golf balls and table-tennis balls, such as tennis balls, footballs, rugby balls and similar balls (including bladders and covers for such balls); water polo, basketball and similar valve type balls; cricket balls.

(7) Ice skates and roller skates, including skating boots with skates attached.

(8) Sticks and bats for hockey, cricket, lacrosse, etc.; chistera (jai alai scoops); pucks for ice hockey; curling stones.

(9) Nets for various games (tennis, badminton, volleyball, football, basketball, etc.).

(10) Fencing equipment: fencing foils, sabres and rapiers and their parts (e.g., blades, guards, hilts and buttons or stops), etc.

(11) Archery equipment, such as bows, arrows and targets.

(12) Equipment of a kind used in children's playgrounds (e.g., swings, slides, see-saws and giant strides).

(13) Protective equipment for sports or games, e.g., fencing masks and breast plates, elbow and knee pads, cricket pads, shin-guards.

(14) Other articles and equipment, such as requisites for deck tennis, quoits or bowls; skate boards; racket presses; mallets for polo or croquet; boomerangs; ice axes; clay pigeons and clay pigeon projectors; bobsleighs (bobsleds), luges and similar non-motorised vehicles for sliding on snow or ice.

which is the example arguably the closest to the subject merchandise, identifies "[p]rotective equipment for sports or games, e.g., fencing masks and breast plates, elbow and knee pads, cricket pads, shin-guards." EN 95.06(B)(13). Even that example, however, refers exclusively to items such as masks, plates, pads, and guards, and it does not reference articles that have more than minimal textile components.

LeMans contends that the CIT erred in considering the Explanatory Notes because: (1) the list in EN 95.06(B) is not exhaustive and, therefore, that heading *could* include apparel-like articles; and (2) the Explanatory Notes conflict with the plain meaning of the term "sports equipment." Neither of these arguments is persuasive. Although LeMans is correct that the list of examples in EN 95.06(B) is not exclusive, the CIT did not find that the Explanatory Notes *precluded* classification of LeMans' goods as sports equipment, it found only that these examples informed its interpretation of the term "sports equipment." The examples in EN 95.06(B) do not conflict with the term "sports equipment," moreover; they merely clarify the scope of that term. Use of Explanatory Notes in this manner to interpret a heading of the HTSUS is entirely proper. *See StoreWALL, LLC v. United States*, 644 F.3d 1358, 1363 (Fed. Cir. 2011) (rejecting an argument that importation of an exclusion from the Explanatory Notes improperly contradicts a term in a heading, finding that it "instead clarifies the scope of the term").

This case is unlike *Airflow Technology*, which LeMans cites, where we discounted the significance of Explanatory Notes because they were broader than, and directly at odds with, a subheading term. *Airflow Tech., Inc. v. United States*, 524 F.3d 1287, 1292-93 (Fed. Cir. 2008). In

---

EN 95.06(B).

*Airflow Technology*, we found that, pursuant to dictionary definitions, the term "straining cloth" in subheading 5911.40.00 meant only material that separated solids from liquids and was not synonymous with "filtering cloth," which had the broader capability of separating solids from liquids *or* from gases, such as an air filter. *Id.* at 1291-92. The Explanatory Notes to Heading 5911, however, suggested that "straining cloth" included any type of filtering cloth, including those used for filtering air. *Id.* at 1292-93. Because the Explanatory Notes were broader than, and directly contradictory to, a common meaning of a subheading term, we did not give those notes any weight. *Id.* at 1293. In this case, unlike in *Airflow Technology*, none of the examples in EN 95.06(B) are broader than the term "sports equipment," nor do they directly contradict either of the two definitions for that term that LeMans itself proposes – i.e, goods that are necessary, useful, or appropriate for a sport, or goods that are specially designed and intended for use in a particular sport. Accordingly, *Airflow Technology* does not compel a different result here.

Lemans also relies on *Rubie's* to support its position that it is improper to resort to the Explanatory Notes in this case. In *Rubie's*, we explained that, "[a]bsent a clearer showing of congressional intent, we refuse to import incidental characteristics of the examples in the Explanatory Notes into the headings of the HTSUS." *Id.* at 1359. Like *Airflow Technology*, however, *Rubie's* does not compel the conclusion LeMans urges.

In *Rubie's*, we already had determined that the costumes at issue did not constitute "fancy dress of textiles, of chapters 61 and 62," such that accepting the government's distinction between "accessories" and "wearing apparel" based on the Explanatory Notes would have contradicted our earlier determination. In other words, to

the extent our statement in *Rubie's* simply declined to give weight to Explanatory Notes that contradicted an already-defined term, it is distinguishable for the same reasons as *Airflow Technology*. The Explanatory Notes in *Rubie's*, moreover, listed a total of only seven examples on which the government relied that possessed what we described as "incidental characteristics," whereas the Explanatory Notes in this case list as examples fourteen separate *categories* of goods, identifying over fifty individual items, which uniformly consist of goods that are non-apparel like in nature. These non-apparel characteristics are more than merely "incidental"; they overwhelmingly support the conclusion that the term "sports equipment" does not encompass apparel such as the subject merchandise.

Accordingly, we find that the CIT properly looked to the Explanatory Notes to Section 9506 to assist with the interpretation of Heading 9506. The vast majority of the examples in those notes are items that a user would not wear on his or her body, but instead consist of articles that are entirely separate from the user (e.g., tennis nets, children's playground equipment, archery targets, bobsleds), held by the user in his or her hand (e.g., golf clubs, tennis rackets, polo mallets, hockey sticks), or are accessories fastened to a user (e.g., snow skis, water skis, ice skates). The few examples that a user actually would wear, which are identified in Example (13), are almost exclusively used for protection and would complement, or be worn in addition to, apparel worn for a particular sport. We therefore agree with the CIT that the Explanatory Notes distinguish the subject merchandise in this case from the goods properly classified under Heading 9506. Considering the definition of "sports equipment" as informed and clarified by these Explanatory Notes, the subject merchandise is not *prima facie* classifiable as

sports equipment under Chapter 95. [7]

CONCLUSION

For the reasons stated above, the judgment of the CIT is affirmed.

**AFFIRMED**

COSTS

Each party shall bear its own costs.

---

[7] We also agree with the CIT that this conclusion is supported by Note 1(e) to Chapter 95, which excludes from that chapter "sports clothing or fancy dress, of textiles, of chapter 61 or 62." We acknowledge that Note 1(t) to Section XI, which encompasses Chapters 61 and 62, excludes from Section XI "Articles of chapter 95 (for example, toys, games, sports requisites and nets)," and that, in *Bauer*, we indicated it is inappropriate to resort to these competing exclusionary notes before determining the appropriate heading because that would "yield the somewhat arbitrary result that the subject merchandise could be classified under different chapters based solely on which chapter the analysis began." *Bauer*, 393 F.3d at 1253 n.6. In this case, because we first have found that the subject merchandise is properly classifiable as apparel under Chapter 61 or 62, and that it is not classifiable as sports equipment under Chapter 95, we do not run afoul of our warning in *Bauer* by finding that Note 1(e) bolsters our conclusion.